Law *v.* Mackie, Appellant.

Argued January 13, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and ARNOLD, JJ.

*Earl G. Harrison,* with him *C. P. O'Malley, John W. Bour, James W. Scanlon, Wm. A. Schnader* and *Schnader, Harrison, Segal & Lewis,* for appellant.

*Will Leach,* with him *John R. Lenahan* and *Leach & Lenahan,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, March 23, 1953:

This case unfortunately has its origin in a dispute between members of the bar over a fee. The fee, in the amount of $125,000, was received by the defendant, Matthew D. Mackie, during the existence of a partnership between Mackie, who was the senior partner, and the plaintiff, Raymond T. Law, the junior partner. Defendant claimed that the fee was not a partnership asset but was earned solely by and belonged exclusively to him individually and that the plaintiff so understood. Plaintiff denied this and claimed it was a partnership asset in which he was entitled to participate. A brother lawyer, acting as an intermediary, obtained from both plaintiff and defendant assent to a settlement of the dispute, the terms of which and the circumstances surrounding its making being hereinafter set forth. Plaintiff filed a bill in equity praying that the settlement of the dispute be set aside as fraudulent on the part of the defendant, illegal and void, and that the defendant be required to make an accounting of partnership matters to the plaintiff. In his answer to the bill the defendant denied liability to account, relying upon the settlement, the terms of which it was averred were carried into effect, constituting a complete accord and satisfaction. Hearings were had before the chancellor who entered a decree nisi directing the defendant to render an accounting as prayed for. Defendant's exceptions thereto were overruled by the court en banc and a final decree entered in favor of the plaintiff. Defendant appealed therefrom under the provisions of the Act of June 24, 1895, P. L. 243, as amended, 12 PS §1104, which permits an appeal to this Court upon the preliminary question of defendant's liability to account.

On or about January 1, 1943 the plaintiff, the defendant and a third lawyer, John W. Murphy, formed a partnership under the firm name of Mackie, Murphy & Law, with offices in Scranton, Pennsylvania. Each partner made a capital contribution of $1,500. In 1946 Mr. Murphy was appointed Judge of the United States District Court and in September of that year the partnership consisted only of Mackie & Law. Both partnerships were formed under oral agreements and were partnerships at will. In the earlier partnership, profits were basically divided 37½% to Mackie, 37½% to Murphy and 25% to Law. When the partnership became Mackie & Law, the basic division of profits was 60% to Mackie and 40% to Law. While Murphy was with the firm, he became a member of Congress and relinquished some of his share of the profits which resulted in adjustments in the distribution of profits of the partnership between Mackie and Law.

In 1939, prior to the formation of the first partnership, one Amedeo Obici became a client of Mackie who drew his will. The will was redrafted seven times. Nineteen trusts were drafted and redrafted by Mackie, but finally the number was reduced to four. Mackie did not receive any compensation during Obici's lifetime for drafting these wills and trusts.

In May, 1947 Obici died and his executors retained Mackie individually to represent the estate which amounted to more than $2,000,000. A few months later they requested that Mackie write them a letter stating that he alone represented them and subsequently asked Mackie to have separate stationery printed for use in Obici matters showing only his name and not that of a firm. This was done. About October 15, 1948 Mackie received a fee of $125,000 from the Obici Estate. The item in the executors' account read: "10-4-48 Matthew D. Mackie—Professional services cov-

ering estate planning, drawing trusts and wills and administration of estate 125,000". Mackie opened, and deposited the fee in, a special account from which he made various payments to persons who had assisted him both in the planning and in the settlement of the Obici Estate. This was done with Law's knowledge, although the parties do not agree as to the circumstances under which the special account was opened.

On October 31, 1948 Law became ill and from November 20th to December 4th was in the Jefferson Hospital in Philadelphia. He was absent from the office from November 1st to December 15th. On the latter date, according to Law, or on December 23, 1948, according to Mackie, the two had a heated quarrel in disagreement as to whether Mr. Law was entitled to any part of the Obici fee, and this resulted in the dissolution of the firm. Mackie ordered the partnership books closed as of December 23, 1948 and removed them from the outer office to his own private office. On the same day he closed the partnership bank account and deposited the balance of $14,532.29 in a new account under the name "Matthew D. Mackie, Trustee". All of this balance but $2,638.14 belonged to Mackie or his clients. On December 31, 1948 Mackie also withdrew the balance of $103,836 in his special account in which the Obici fee had been deposited and had a cashier's check issued to himself in that amount which he put in his safe-deposit box. On the day of the quarrel or shortly thereafter, Law turned over to Mackie all of the files of Mackie's clients on which he had been working, and left the office.

In April of 1947 the plaintiff and defendant as partners became office associates with other counsel under the firm name of Welles, Mackie Mumford & Law. Mumford resigned in the early part of 1948 and thereafter the association was known as Welles, Mackie

& Law. This association did not, however, affect in any way the partnership between plaintiff and defendant. About the first of January, 1949 Charles H. Welles, III of the association mentioned, volunteered to attempt to resolve the dispute between the two partners. With Law's assent, Welles called on Mackie and worked out with the latter a proposal which Welles reduced to writing in longhand, in duplicate. Law was not present during this conference. Welles submitted this proposal to Law who first refused it but later notified Welles that it was acceptable. The terms of the settlement as set forth in the written proposal thus accepted by Law were as follows: "(1) Beginning Jan. 1, 1949. (a) Ray [Law] to keep all fees on business he brings in. (b) Also all fees on compensation cases. (c) On cases Matt [Mackie] turns over to Ray for handling, Ray to keep 2/3 of fees. (d) Ray to pay ¼ of expenses. (2) As to past fees, books were closed December 23, 1948, Ray to receive 40% of net as shown thereon. (3) Matt to pay Ray capital of $1500. (4) Matt to pay Ray additional $6000. (5) All fees received after Dec. 23, 1948, on work already performed shall be retained in full by one who did the work (for example, Ray will keep all of Tudor fee).". The $6,-000 referred to in item 4 pertained to the Obici fee. Mackie had first suggested $5,000 as to this item but Welles persuaded him to make it $6,000. Following this settlement, on January 17, 1949 Law returned to the partnership offices and resumed practice. Mackie drew out the trusteed partnership account and put it in the name of Welles, Mackie & Law, bearing the signature of Matthew D. Mackie alone and also put the cashier's check representing the remaining proceeds of the Obici fee back into the special account he had opened. On the same day he drew a check on the special account for the amount of $6,000 and a check

in the amount of $2,436.08 on the new account in the name of Welles, Mackie & Law and gave both checks to Law. The first check was delivered in accordance with item 4 of the settlement and the other check in accordance with items 2 and 3 of the agreement, $936.08 representing the amount due Law under item 2, and $1,500 representing the return of Law's capital contribution under item 3 of the agreement. At the end of January Mackie caused a statement to be prepared showing Law's share of the expenses for that month and Law delivered his check to Mackie covering his one-fourth of the office expenses in accordance with item 1(d) of the agreement. In accordance with item 5 of the agreement, Law received a number of checks, described by him as "a stack", representing fees in matters on which he had worked.

Law retained all of the checks received by him but did not immediately cash them. The parties continued to practice together under the terms of the memorandum agreement during the month of February. On February 28, 1949 Law told Mackie he was not satisfied with "the adjustment" and refused to pay his one-fourth of the expenses for February, left the office and did not return. Toward the end of January, 1949 Law engaged the services of Edward J. Kelly, Esquire, President of the Lackawanna County Bar Association, whom he consulted as to his legal position in his relations with Mackie and sought Kelly's advice as to what he should do. Kelly checked on some law that Law submitted to him. On this occasion Law left with Kelly the two checks for $6,000 and $2,436.08 which he had received from Mackie on January 17th, and a check for $212.06 which Mackie had delivered to Law covering the amount due Law's clients in the trusteed account. On March 2, 1949 Kelly wrote to Mackie stat-

ing he had been consulted by Law and asking for a conference.[1] In addition to Kelly, Law also consulted a lawyer in Wilkes-Barre whose name does not appear. On April 1, 1949 Mr. Law opened his own office in Scranton and attended to whatever law practice he had. On or about May 6, 1949 Kelly returned the three Mackie checks to Law and either that day or the next Law cashed them. At the same time he also cashed the checks received representing fees in matters on which he had worked prior to December 23, 1948.

In July of 1949 Law offered Mackie a check for all the money he had received in accordance with the settlement memorandum. Mackie refused it and on October 20, 1949 Law filed the present bill in equity.

The foregoing facts were undisputed. There was a sharp conflict in the contentions and testimony of the plaintiff and the defendant as to the merits of the controversy, that is, whether the Obici fee belonged to Mackie or to the partnership. Mackie testified that Law fully understood at all times that the Obici fee was not partnership business. Law testified that when the first partnership was formed in 1943, Mackie had

---

[1] Mackie testified that in response to Kelly's letter he went to Kelly's office, taking with him the memorandum of settlement agreement and a statement showing the various adjustments which had been made over the years and also how much Law had earned from his own clients and how much from Mackie's; that he also offered to give Kelly the partnership books and any other records or information he wanted; that Kelly said he would take the matter up with Law; that a few days before Mackie's checks were deposited by Law, Kelly asked Mackie on the telephone whether he would not pay Law some additional amount and that he, Mackie, stated to Kelly that he thought he, Mackie, had been very liberal and that in any event Law and he had made an agreement by which both parties should abide.

said that if Obici died very soon, his business would not be partnership business, but that if he did not die very soon, it would be. Law testified that he had done some work in connection with the preparation of the Obici will and the trusts and also had worked up some memoranda for Mackie after Obici died. Mackie denied that Law had ever done anything to assist in the preparation of the Obici papers or anything in connection with the estate excepting on one occasion when Mackie had asked him as a favor to do some research for him. As to the opening of the special account for the Obici fee, Mackie's version was that he had a right to deposit the fee in a special account because the fee was his. Law stated that it was done because Mackie said he had some disbursements to make out of the fee and did not want them to go through the firm books. Disbursements in substantial amount (later repaid) were made out of the partnership funds for the Obici Estate prior to the receipt of the fee. Mackie testified that this was done with Law's acquiescence to avoid the necessity of keeping separate books for Mackie. Law denied any such understanding and insisted that these disbursements were merely handled as in other cases. There were other conflicts in their testimony as to the merits of the dispute and practically all of the differences in their respective versions in this regard were resolved by the chancellor in favor of the plaintiff. However, the issue before him was whether or not the plaintiff was entitled to an accounting. This was recognized by the chancellor who properly stated at the beginning of his opinion: "Our present decision must be related solely to this question [defendant's liability to account]. It is a preliminary one which requires disposition prior to any hearing on the merits; . . .", citing cases and the Act of 1895, as amended, supra. The resolution of this preliminary issue depended

upon whether there was an accord and satisfaction as asserted by the defendant.

The undisputed facts bearing on this issue show that after Law advised Welles, the intermediary, of his assent to the agreement of settlement, he returned to the partnership offices and resumed practice with Mackie under the terms of the agreement, for a period of nearly two months. In pursuance of the agreement he paid one-fourth of the office expenses for January, 1949, received and retained checks covering his contribution of principal to the former partnership, the balance of his share of the firm profits as of December 23, 1948, all fees in matters on which he had worked prior to that date, and the check of $6,000 which was particularly referable to the Obici fee which, as stated by the chancellor, was "the bone of contention". Mackie on his part performed all of the terms of his proposal as embodied in the agreement.

In *Lucacher v. Kerson et al.*, 355 Pa. 79, 48 A. 2d 857, Justice (now Chief Justice) STERN, in defining an accord and satisfaction, said at p. 80: ". . . Where there is a dispute or disagreement between the debtor and creditor as to their respective rights, a payment tendered in full satisfaction of the other's claim operates as an accord and satisfaction if the payment is accepted and retained. On the other hand, in the absence of such a controversy, the payment of a part of the amount due under a contract, even though accepted by the creditor as in full satisfaction of the debt, does not work a discharge of the entire indebtedness, for the reason that there is no consideration for the creditor's agreement that it should so operate.", citing many Pennsylvania cases in the footnote on page 81.

Mackie testified that when Law returned to the partnership offices on January 17, 1949, he confirmed his acceptance of the settlement agreement. Law, on

the other hand, denied this, and the chancellor found as a fact that Law advised Mackie on his arrival at the offices that he would not accept the terms of the settlement. However, Law proceeded to carry out the terms of the settlement, his actions culminating on or about May 6, 1949 in the cashing of the $6,000 check referable to the Obici fee and all of the other checks received by him. Law's statement that he would not accept the terms of the settlement did not prevent the transaction from constituting an accord and satisfaction in view of his subsequent actions; the same is true with respect to Law's expression of dissatisfaction with the "adjustment" when he left the offices toward the end of February, 1949. See *Blaisdell Filtration Co. v. Bayard & Co., Inc.*, 311 Pa. 6, 166 A. 234; 1 Am. Jur., Accord and Satisfaction, §26; and Restatement, Contracts, §420. An accord and satisfaction is the result of an agreement between the parties which may be and usually does result from an implied agreement arising from the circumstances. If an agreement stems from a disputed claim, the acceptance of an amount less than the creditor claims to be due, when tendered by the debtor in full satisfaction of the creditor's claim, becomes a completed accord and satisfaction. When Law cashed the settlement checks there was a final acceptance of the offer of settlement and an accord and satisfaction resulted, unless vitiated by fraud, deception or some other invalidating element.

There must be an honest dispute and a person cannot create a dispute sufficient for the purpose of an accord and satisfaction by a mere refusal to pay a claim undisputed in fact. Plaintiff contends that defendant's claim to the whole of the Obici fee was fictitious and merely a pretext to provoke a dispute, and therefore cannot support a valid accord and satisfaction. After a careful reading of the entire record we agree

with the chancellor that there was "a real dispute" between the parties.

The chancellor, after citing *Lucacher v. Kerson et al.,* supra, *Giles v. Vockel et al.,* 311 Pa. 347, 166 A. 849 (a partnership case) and other decisions dealing with accord and satisfaction, in his opinion upheld by the court en banc, stated: "Approaching the case at bar in the light of the foregoing decisions, and for the present assuming there was no fraud on the part of the defendant; no mistake or mental incompetence on the part of the plaintiff, there is much support for the conclusion that the settlement here presented constitutes a valid accord and satisfaction. There was a real dispute, a settlement was agreed upon and plaintiff eventually cashed the check given by the defendant.". However, he then proceeded to hold that the accord and satisfaction was vitiated by fraud, mistake and mental incompetence on the part of the plaintiff. We are unanimous in our opinion that the chancellor and the lower court erred in this regard. When findings of basic facts by a chancellor which depend upon credibility of the witnesses are supported by competent evidence, and affirmed by the court en banc, those findings are conclusive upon appeal, but the rule does not apply to the deductions or inferences which are made by the chancellor from such facts. Since his conclusions, whether of law or of ultimate fact, are no more than his reasoning from the underlying facts, they are always reviewable: *Payne v. Winters,* 366 Pa. 299, 77 A. 2d 407; *Noonan Estate,* 361 Pa. 26, 63 A. 2d 80; *Consolidated Home Specialties Company v. Plotkin,* 358 Pa. 14, 55 A. 2d 404; *William Sellers & Co., Inc. v. Clarke-Harrison, Inc., et al.,* 354 Pa. 109, 46 A. 2d 497; *Blue Ridge Metal Manufacturing Company v. Proctor et al.,* 327 Pa. 424, 194 A. 559.

The court below apparently set aside the accord and satisfaction upon the following findings of the chancellor: "29. When the settlement was negotiated the defendant [sic] was suffering from nervous exhaustion rendering him unable to properly protect his own interests or make decisions in matters of importance to himself and he was in a position to be easily taken advantage of. . . . 47. The secreting of the books, the removal of the partnership funds from the partnership account, the refusal to disclose all information concerning the partnership affairs when dealing with the plaintiff then unable to represent himself, constitutes a fraud upon the plaintiff in the dissolution of this partnership and the settlement which followed.", and upon the following conclusion of law: "7. Partners stand in a fiduciary relationship to each other, and a settlement made by one partner without full disclosure and on his own terms when he is in complete and exclusive possession of the firm's books and assets, and without any accounting is fraudulent and void.".

The underlying facts upon which the chancellor made his ultimate finding of fraud (Finding of Fact 47, supra) appear to be the removal by the defendant of the partnership books from the common office of the partnership to his private office, the transfer of the partnership account after the quarrel between the parties in December of 1948 into an account in the defendant's name as trustee, and the withdrawal by defendant of the special account representing the Obici fee when he obtained a cashier's check therefor which he placed in his safe-deposit box. The removal of the partnership books to defendant's own office and the transfer of the partnership account to an account in his name as trustee took place after the dissolution of the partnership resulting from the quarrel. The plain-

tiff had left the offices. Defendant was the senior partner and presumably the liquidating partner, if liquidation followed. Much the larger part of the partnership account represented money of Mackie's clients and he did not convert the account to his own use but placed it in his name as trustee. These acts by the defendant certainly of themselves were not fraudulent. The same is true of the course pursued by the defendant with respect to the special account representing the Obici fee. Defendant claimed that the proceeds of the Obici fee belonged solely to him, and after the plaintiff's claim to participation therein and his threat to sue the defendant according to the defendant's testimony, it was possible, if not quite probable, that Law would endeavor to attach it. Moreover, if fraudulent intent be imputed to the defendant, there was nothing to show that plaintiff was misled by the defendant's actions or that they had any effect on plaintiff in so far as the agreement of settlement and its consummation were concerned. He knew of the Obici fee, its amount and that the special account had been created. Its transfer into a cashier's check which was placed in defendant's safe-deposit box was not known by plaintiff until after the present suit had been brought and therefore could not have influenced him in any way with respect to the settlement. There was no evidence that the defendant took possession of the books to conceal anything or that the books were altered in any way. Their removal had no effect upon the settlement. There was no evidence or contention that plaintiff requested or was refused access to them or that if he had seen them he would have found anything in them that he did not already know. The books were not discussed during the negotiations leading up to the settlement agreement and Welles, who brought about the agreement, testified that plaintiff never asked

him to examine or obtain the books.[2] Law did not testify that Mackie at any time prior to his final withdrawal from the offices at the end of February of 1949 refused him access to the partnership books or to any partnership records. It may be added that after Law returned to the office and resumed practice with Mackie in January of 1949, things were restored to their former status. Mackie testified that the books were "free for anybody to examine". This met no denial by Law. And of course the consummation of the settlement by the cashing of the Mackie checks did not occur until May, 1949. The Restatement, Contracts, §476, comment c, pertinently states: "No legal effect is caused by either fraudulent or other misrepresentation unless it induces affirmative or negative conduct, . . .", and in §479, comment a, it is said: ". . . Neither fraud nor misrepresentation produces legal consequences unless it induces action . . . in all cases the element of causation must exist.". The plaintiff, who had the burden of proof, failed to establish fraud as a basis for setting aside the accord and satisfaction—certainly the evidence in this regard fell far short of the *convincing* proofs required: See *Wagner v. Somerset*, 372 Pa. 338, 93 A. 2d 440; *Birdsall-Friedman Company v. Globe and Rutgers Insurance Company*, 326 Pa. 404, 190 A. 924.

In making his Finding of Fact 29, above quoted, the chancellor relied upon the testimony of Dr. Keyes, a psychiatrist who attended the plaintiff while he was in the hospital from November 20th to December 4, 1948. This doctor testified that the plaintiff had gone through

---

[2] Mackie testified (see footnote 1, supra) that he voluntarily offered to give the partnership books and any information desired to Mr. Kelly when the latter was representing Law. This was prior to Law's final consummation of the settlement agreement through the cashing of the checks received from Mackie.

severe emotional trials occasioned by the deaths of immediate members of his family, especially of a sister who had died about a year before, which gave him guilt feelings brought about by his thought that he had not done all that he could for her. He testified this was ". . . a very normal thing and we all have it; when somebody close to us dies, of course we feel responsible, feel guilty, thinking about what we had not done or might have done.". He testified that in plaintiff's case this self-criticism was more severe than usual and that this made plaintiff unable to defend himself very well in a matter involving himself emotionally, although perfectly competent to handle other peoples' affairs. We quote from his testimony: "Q. What do you call this condition, Doctor, where a man can't take care of himself but he can take care of other peoples' matters? A. I think you have misunderstood me. I said that he was at all times mentally competent, but that when it came to matters in which he had a feeling of personal responsibility or accepting things or fighting for things, because he was punishing himself with these guilt feelings, he would therefore be unable to aggressively defend himself. Q. Well, wouldn't the same thing apply in a trial of a lawsuit of clients and the handling of clients' affairs when he was meeting lawyers who were equally as capable as he, wouldn't he have the feeling that he wasn't hitting the ball or not capable of defending himself or his client? A. I think he would defend very well where the matter was objective and not a matter involving himself emotionally. A thing in which he was involved emotionally, there would be a blockage, his judgment would be poor and he would give in rather than go on, but in handling other peoples' affairs he would be objective and clear. He would probably have to put out more than he would if he were not ill, but he would still be competent.". After

plaintiff left the hospital at Philadelphia, the doctor did not see him again until July of 1949 when he stated that the plaintiff was definitely improved. He was asked for his opinion as to the plaintiff's competency in January, February and March of 1949 and testified, ". . . I think the same conditions prevailed during the period of many months.". However, he testified that the only contact he had with the plaintiff after the latter left the hospital was by telephone calls and some correspondence in January, February and April of 1949. He was not asked what the plaintiff's condition was during May of 1949 when plaintiff cashed the checks which he received under the settlement agreement. The plaintiff did not testify or claim that he was mentally incompetent at any time. The plaintiff testified that when he was in the hospital at Philadelphia he was in a state of mental and physical exhaustion. The chancellor in his Finding 29 now being considered, relates the plaintiff's "nervous exhaustion" to the time "when the settlement was negotiated". Whatever may have been plaintiff's physical and nervous or mental condition when the settlement was negotiated in January of 1949, it abundantly appears from his own testimony that he comprehended the facts and circumstances leading to the settlement agreement negotiated by his associate, Welles. His only concern was the Obici fee. He stoutly claimed in his quarrel with Mackie in the middle or latter part of December that he was entitled to participate therein, made no surrender or compromise of his position but left the partnership offices. He was not thereafter compelled or called upon to "aggressively defend himself". With his consent *Welles* interviewed and obtained the proposal in writing from Mackie. Plaintiff took the proposal home, "considered it" for several days, consulted with his "folks" at home, and after several days' de-

liberation advised Welles of his acceptance. During this time he did not see Mackie who admittedly at no time during the negotiations made any representations to him. He returned to the partnership offices and continued practice under the new arrangement. Moreover his final consummation of the settlement proposal occurred when he cashed the checks in May, four months after the proposal was first submitted to him. And in the meantime he had separately consulted two attorneys with respect to the matter. On April 1st he opened his own law office.

We find it impossible to conclude that he did not completely understand what he was doing when he finally cashed the checks received in settlement, resulting in a complete accord and satisfaction. The plaintiff did not testify nor did the chancellor find that at such time plaintiff was mentally weak or deficient. Even if he were, as early as *Aiman et al. v. Stout*, 42 Pa. 114, this Court declared that mere mental weakness will not authorize a court of equity to set aside an executed contract, if it does not amount to inability to comprehend the contract, and is unaccompanied by evidence of imposition or undue influence. Although the chancellor in his opinion used the terms "overreaching" and "undue influence", the record is barren of any support for a finding of overreaching, imposition or undue influence in so far as the agreement of settlement is concerned. The same is true of the terms "mistake" and "duress" employed by him. The chancellor makes no finding that plaintiff entered into the settlement agreement because of mistake as to any material fact, nor can we find anything that would have justified such a finding. Our review of the evidence fails to disclose any duress exercised by the defendant. The negotiations for the settlement reached

were conducted through an office associate and mutual friend.

The chancellor's conclusion of law (No. 7 above quoted) is a general statement of the law in the abstract. It is inapplicable to the concrete situation here presented. As we have pointed out, plaintiff knew about the Obici fee which was the sole subject matter of the dispute. Prior to the institution of this proceeding, he never requested nor was refused access to the partnership books which, if not before, were available for his examination upon his return to the partnership offices which was months before he finally consummated the settlement. As said before, he was not misled or induced to enter into and consummate the agreement by any misrepresentation or concealment on the part of the defendant, or by any ignorance on his part of any material fact.

Toward the end of his opinion the chancellor states: ". . . Further, in our opinion, in view of the evidence of pending estates, trusts and other matters involving fees now due or to become due to the partnership an accounting furnishes the only means of arriving at a just solution of the difficulties between the parties to this law suit.". It is sufficient to state that when plaintiff cashed the various checks in May of 1949, the entire settlement agreement became effective and it covered the disposition of all fees then or thereafter becoming due. It may be added that no controversy with respect thereto appears from the evidence.

The sole question before us on this appeal is whether plaintiff was entitled to an account. However meritorious plaintiff's position may have been as to the merits of the controversy between the parties, he chose to compromise his claim when he accepted the defendant's proposal of settlement. We are all of the opinion that there was a valid accord and satisfaction bind-

ing upon the plaintiff and by virtue thereof defendant was not liable to account.

The decree of the court below is reversed and the bill is dismissed. Each party to pay his own costs.