Kelly *v.* Philadelphia, Appellant.

460

Argued April 19, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*James L. Stern,* Deputy City Solicitor, and *Herbert M. Linsenberg,* Assistant City Solicitor, with them *Jerome J. Shestack,* First Deputy City Solicitor and *Abraham L. Freedman,* City Solicitor, for defendants, appellants.

*John Edward Sheridan,* for plaintiff, Kelly, appellee.

*Walter B. Saul,* and *Henry J. Morgan,* with them *James P. Gilliland* and *Joseph P. Flanagan,* for Queen Lane Park, Inc., appellant.

OPINION BY MR. JUSTICE CHIDSEY, June 27, 1955:

These appeals present two principal questions (1) whether the evidence supports the chancellor's conclusion that the operation of a proposed municipal incinerator of 600-ton capacity on an area of land in the City of Philadelphia would create a nuisance in fact; (2) whether a certain ordinance of the City changing the classification of the area in question to allow the construction of the incinerator thereon was validly enacted. The litigation arose out of complaints in equity filed by John B. Kelly, a taxpayer, and Queen Lane Park, Inc., the owner of an undeveloped tract of land immediately adjacent to the proposed site of the

incinerator, seeking to restrain the City of Philadelphia and its officials from enforcing in any manner the ordinance approved March 13, 1953 changing the classification of a City-owned tract of land in the vicinity of Fox Street and Abbottsford Avenue from Class "B" and Class "C" Residential to Class "Least Restricted" and from proceeding with the erection of the incinerator on the property so rezoned.

In an attempt to cope with a serious refuse disposal problem, the City administration had for some time under consideration a plan to build new municipal incinerators and to increase the capacity of existing ones, the aim being to provide for complete disposal of refuse by incineration in four sanitation districts, each district encompassing approximately one-fourth of the present and anticipated future population of the City. The proposed incinerator involved in this case was to serve the Northwest District of the City, having a population of approximately 550,000 residents.

To effectuate this purpose, on or about June 26, 1952 Bill No. 315 was introduced in Council entitled "An ordinance to amend an ordinance known as 'Philadelphia Zoning Ordinance and Zoning Maps' approved August 10, 1933, by changing designation for the following portion of the City of Philadelphia from partly Class B residential and partly Class C residential to Class Least Restricted: Northeast side of Fox Street 280 feet 8 5/8 inches northwest of Abbottsford Avenue". In July of 1952 protests were filed with the President of City Council by more than 20% of the owners of land immediately adjacent to the area sought to be rezoned opposing the change of zoning. Notice of a public councilmanic hearing on the bill, to be held on September 16, 1952, was published in three newspapers of general circulation in the City

of Philadelphia eight days prior to the hearing. At the hearing the plaintiffs and numerous other persons appeared to protest the proposed zoning change. Thereafter, on February 26, 1953, a committee of Council reported out an amended bill which subdivided the City's lot and rezoned it so that two strips of land, each approximately 100 feet in width, immediately adjacent to the tracts owned by the protestants, were eliminated from the north and south ends thereof. Under this amendment these strips retained their classification of "B" and "C" Residential.[1] As amended, the bill was passed on March 12, 1953 by a vote of 11 to 5, which was less than three-fourths of the membership of Council, without readvertisement or further public hearing, and on the following day, March 13, 1953, it was approved by the Mayor.

After many hearings producing a printed record of more than 1,000 pages, the chancellor upheld the validity of the ordinance but concluded that the operation of the incinerator, if erected, would constitute a nuisance in fact, and thereupon entered the following decree nisi: ". . . That the City of Philadelphia is hereby restrained from operating a six hundred ton incinerator at Fox Street and Abbottsford Avenue; this decree to remain in effect 'until such time as the Court shall determine that such a substantial and material change in the character of the neighborhood has occurred so that the operation of an incinerator of such size will not constitute a nuisance in fact' . . .". Ex-

---

[1] The effect of the amendment was a severance of 100 feet between the actual area to be rezoned and the property of the protestants, thereby rendering inapplicable the provisions of Section 5 of the Act of May 6, 1929, P. L. 1551, requiring a three-fourths vote of the membership of Council when 20% of the owners of the land immediately adjacent to and extending 100 feet from the lots to be rezoned protest the change.

ceptions thereto filed by both parties were dismissed and the decree nisi was adopted and entered as a final decree.

A careful reading of the lengthy record compels us to disagree with the conclusion on which the decree is based. At the outset it is to be observed that the chancellor correctly found that the incinerator would not be a nuisance *per se,* and plaintiffs do not contend otherwise. The conclusion of the court below rests solely upon the chancellor's findings that the *operation* of the incinerator after its erection *will* constitute a nuisance in fact.

Our decisions are in accord with those of the majority of jurisdictions that before an injunction will be granted to restrain a threatened nuisance it must clearly appear that a nuisance will necessarily result from a contemplated act which it is sought to enjoin. In *Pennsylvania Co., etc. et al. v. Sun Co.,* 290 Pa. 404, 138 A. 909, we said at p. 413: ". . . Where it is sought to enjoin an anticipated nuisance, it must be shown (a) that the proposed construction or the use to be made of property will be a nuisance per se, (b) or that, while it may not amount to a nuisance per se, under the circumstances of the case a nuisance *must necessarily result* from the contemplated act or thing. See 7 A. L. R. 749; 26 A. L. R. 937. The injury must be actually threatened, not merely anticipated; it must be *practically certain,* not merely probable. . .". (Emphasis supplied). In *White et al. v. Old York Road Country Club et al.,* 322 Pa. 147, 185 A. 316, Mr. Chief Justice KEPHART, speaking for a unanimous Court, said at p. 152: "In these cases [of anticipated nuisance] equity cannot act with too much caution. Its strong arm must not be allowed to fall with destructive effect upon a lawful and necessary business, unless it is plainly manifest and certain beyond doubt that the

pursuit of the trade would result in substantial injury. . .". In *Rhodes et al. v. Dunbar et al.*, 57 Pa. 274, cited with approval in the *Pennsylvania Co.* case, supra, it was stated: ". . . 'As a general rule the court ought not to interfere in cases of nuisances, where the injury apprehended is of a character to justify conflicting opinions, whether the danger will in fact be ever realized.' ". The evidence in the present case was conflicting throughout. The testimony of the lay and expert witnesses on behalf of the plaintiffs was to the effect that the operation of the incinerator would create conditions constituting an enjoinable nuisance. On the other hand, the lay and expert testimony adduced by the City, of *at least* equal quality and persuasiveness, was directly to the contrary. Under this state of the evidence, it could not be held that a nuisance would necessarily result from the operation of the incinerator.

The chancellor, confronted by the diverse views of the witnesses, principally the diametrically opposed opinions of the experts called, without questioning the honesty of their views or beliefs, apparently disregarded the testimony adduced by the City and adopted that offered by the plaintiffs. While it is true that findings of fact made by a chancellor, confirmed by the court en banc, will not ordinarily be reversed on appeal when supported by adequate evidence, conclusions whether of law or ultimate fact are no more than his reasoning from the underlying facts and are reviewable: *Law v. Mackie,* 373 Pa. 212, 223, 95 A. 2d 656; *Peters v. Machikas,* 378 Pa. 52, 56, 105 A. 2d 708, and cases cited therein. This is all the more true where the underlying facts themselves are not in esse but matter of inference and deduction. In the instant case the basic facts upon which the ultimate finding or conclusion that a nuisance would be created by the opera-

tion of the incinerator were not existing facts but were potential in character, necessarily conjectural and uncertain. Even if these potential facts were justifiably inferable from the plaintiffs' testimony, they were counter-balanced by the potential facts inferable from the testimony adduced on behalf of the City. In view of such counterpoise of the evidence, neither the chancellor nor this Court, under the established decisional law, could properly hold that the operation of the proposed incinerator would "necessarily result" in a nuisance. We will not review in detail the findings of the chancellor in this regard and the conflicting evidence which destroyed their efficacy, for, as hereinafter appears, we are of the opinion that the ordinance in question was invalid, and consequently for that reason plaintiffs were entitled to the injunction prayed for.

In support of the validity of the ordinance, the City argues preliminarily that it was not bound by zoning restrictions when it selected the incinerator site in the ordinance of March 13, 1953 inasmuch as it was not a true zoning ordinance but rather an exercise of the police power, and cites in support thereof *Lees v. Sampson Land Company,* 372 Pa. 126, 92 A. 2d 692, and *Sheets et al. v. Armstrong et al.,* 307 Pa. 385, 161 A. 359. It is now well settled in Pennsylvania and a majority of other jurisdictions that the operation of a municipal incinerator plant is primarily a health measure and therefore a governmental function of the municipality within the police power, as opposed to a proprietary function: *Kunz v. Titusville,* 373 Pa. 528, 97 A. 2d 42. Equally well established is the proposition that a municipal corporation may abrogate zoning restrictions in a valid exercise of its police power. In *Sheets v. Armstrong,* supra, plaintiff sought to restrain the Commissioners of Allegheny County from purchasing certain land in the City of Pittsburgh for

a public auditorium on the ground that the proposed building would violate the city zoning ordinance. The City of Pittsburgh by ordinance consented to the acquisition of the property by the county and the erection of the auditorium. In the consent ordinance the city expressly repealed any ordinance conflicting with the provisions of the ordinance in question. We there held at p. 391 that ". . . The effect of this enactment was to abrogate the zoning ordinance so far as this property is concerned. The city could not consent to the acquiring of the land and the erection of the building with one hand and forbid its erection by the zoning ordinance with the other. . .". In *Lees v. Sampson Land Company*, supra, the plaintiffs brought an action in equity to enjoin the erection of a sewage disposal plant in Penn Township, Allegheny County, Pennsylvania, averring, inter alia, that the proposed plant would violate an ordinance of the Township prohibiting such an operation within a residential area. The ordinance there under consideration expressly provided that a building could be erected in a residential district for municipal use. On the authority of *Sheets v. Armstrong*, supra, this Court said: "If a municipality therefore can exempt itself from the provisions of a zoning ordinance which has already been enacted, it can all the more exempt itself from the outset by appropriate provision in the zoning ordinance itself.".

In the instant case the City did not attempt to establish a site for the incinerator in an independent exercise of its governmental power but by a change in its zoning law. The bill in question is entitled "An Ordinance to Amend an Ordinance Known as 'Philadelphia Zoning Ordinance and Zoning Maps' Approved August 10, 1933 . . .". Section 23 of this basic zoning ordinance enacted under the enabling Act of 1929, P. L. 1551, 53 PS §3822 et seq., provides that the City

is exempted from the provisions of the ordinance in the performance of governmental functions, *only* in districts designated as "Least Restricted". Unlike the above cited cases, the City did not exempt itself initially or thereafter from the zoning restrictions of the 1933 ordinance. The proposed amendment sought to circumvent the limitation respecting governmental uses contained in Section 23 by rezoning the area involved from Residential to Class "Least Restricted". Assuming that this was a lawful avoidance and not an illegal evasion of Section 23, the proposed zoning change nevertheless had to be accomplished under the procedural requirements of the enabling Act of 1929 to which the ordinance of 1933 was subject, unless such procedural requirements were impliedly repealed or superseded by the Philadelphia Home Rule Charter adopted by the electorate on April 17, 1951.

Section 4 of the Act of 1929 provides for at least fifteen days' notice prior to a public hearing on proposed zoning ordinances. Section 5 calls for a vote of three-fourths of the members of Council to effect a change in any zoning ordinance if protested by the owners of 20% or more of the land immediately adjacent to the lots proposed to be rezoned, and makes the provisions of Section 4 equally applicable to all amendments and changes. It is admitted in the present case that notice of a public hearing on the proposed ordinance was published only eight days prior to the hearing and that the ordinance was passed by a simple majority vote of the members of City Council without further advertising or public hearing. It is the City's position that the ordinance was passed in conformity with the procedural requirements of Sections 2-201(5) and 2-201(7) of the City Charter which, it is contended, supersede the requirements of Sections 4 and 5 of the Act of 1929. These sections of the Charter

provide in effect respectively that notice of public hearings on bills introduced in City Council shall be published "not less than 5 days before" such hearings [2] and that no bill shall become an ordinance unless passed by a majority of all the members of Council. [3] The court below was of the opinion that these sections of the Charter established a detailed system of procedure for all ordinances and consequently the procedural requirements of the Act of 1929 no longer applied to zoning legislation in the City of Philadelphia.

As stated in *Kline et al. v. Harrisburg et al.*, 362 Pa. 438, 447, 68 A. 2d 182, zoning laws are enacted in the exercise of the police power and in the absence of a specific legislative or constitutional grant, municipalities have no authority to enact zoning ordinances. Philadelphia was initially empowered to enact zoning legislation by ordinance by the Act of 1929, supra. By virtue of this Act the City of Philadelphia passed its basic zoning ordinance of 1933 and in so doing adopted the procedural provisions set forth in the enabling Act of 1929.

Under the First Class City Home Rule Act of April 21, 1949, P. L. 665, 53 PS §3421.1 et seq., a city taking advantage of the Act, subject to certain limitations in

---

[2] "Notice of public hearings on bills and notice of bills reported from committee shall be given by advertising in the three daily newspapers of the City having the largest paid circulation, the title of the bill, and in the case of a public hearing, the time and place of the hearing, not less than five days before the public hearing or before the bill comes up for final consideration, as the case may be. In addition, such other notice may be given as will bring public hearings or reported bills to the attention of interested citizens. There need be no advertisement of ordinances after their passage."

[3] "No bill shall become an ordinance unless a majority of all the members of the Council be recorded as voting in its favor."

Section 18 not here applicable, was granted all powers and authority of local self-government together with complete powers of legislation and administration relative to its municipal functions. Section 17 of the Act provided in part that ". . . The charter of any city adopted or amended in accordance with this act may provide for a form or system of municipal government and for the exercise of any and all powers relating to its municipal functions, not inconsistent with the Constitution of the United States or of this Commonwealth, to the full extent that the General Assembly may legislate in reference thereto as to cities of the first class, and with like effect, and the city may enact ordinances, rules and regulations necessary and proper for carrying into execution the foregoing powers and all other powers vested in the city by the charter it adopts or by this or any other law. . .". Since the power to zone is not one of the specifically enumerated limitations set forth in Section 18 of the Home Rule Act, such power is fairly included under the sweeping grant contained in Section 17, supra. In pursuance of the power conferred, the electors adopted the Philadelphia Home Rule Charter on April 17, 1951 and created therein a new City Planning Commission and a Zoning Board of Adjustment to administer zoning in Philadelphia.

Section 11-101 of the Charter provides that "Subject to Section 18 of the Act of the General Assembly approved April 21, 1949, P. L. 665, of the Commonwealth of Pennsylvania, it is the intention of the electors in adopting this charter that it shall supersede all statutes or parts of statutes, local, special or general, and all ordinances of the City, affecting the organization, government and powers of the City *to the extent that they are inconsistent or in conflict with this charter.*". (Emphasis supplied).

The crucial question is whether the provisions of the Charter are so inconsistent with those of the enabling Act of 1929 as to supersede or repeal the procedural prerequisites contained in that prior Act. The City presents the dual argument that the provisions are clearly inconsistent and therefore Section 11-101 of the Charter applies, and secondly, that since the Charter establishes a "comprehensive" procedure for effecting changes in zoning and is later in time than the Act of 1929, there was an implied repeal of the earlier Act.

In determining whether a prior Act is repealed by implication, the question is exclusively one of legislative intent. Repeals by implication are not favored and will not be implied unless there be an irreconcilable conflict between statutes embracing the same subject matter. The fact that the Charter was enacted subsequent to the specific provisions in the Act of 1929 and that there is a general repealing clause in the Charter is not necessarily conclusive on the issue of legislative intent. There is an explicit recognition in Section 11-101 of the Charter that earlier legislative provisions not inconsistent therewith are to remain in force.[4] It is apparent that the Act of 1929 and the Charter both deal with the same subject matter, yet, it is equally clear that the Charter does not purport to furnish a comprehensive scheme of zoning. For example, no provision is contained therein for penalties in the event the zoning ordinances or regulations are violated, and as a result it becomes necessary to refer back to the Act of 1929 to ascertain the penalty. It is also significant that although the new Zoning Board

---

[4] Section 11 of the Home Rule Act provides: ". . . All existing acts or parts of acts and ordinances affecting the organization, government and powers of the city, not inconsistent or in conflict with the organic law so adopted, shall remain in full force. . .".

of Adjustment is placed within the Department of Licenses and Inspections under the Charter, nevertheless, it has substantially the same powers under Section 5-1006 as it did under the enabling Act of 1929 and the powers thus conferred must be exercised "in accordance with any statute or ordinance as now or hereafter in force". And see the annotation to this section prepared by the Drafting Committee of the Charter.

As we view it, the present case comes within the canon of construction applied in numerous cases and set forth in the Statutory Construction Act of May 28, 1937, P. L. 1019, §63, 46 PS §563, as follows: "Whenever a general provision in a law shall be in conflict with a special provision in the same or another law, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions be irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the Legislature that such general provision shall prevail.". Tested in the light of this principle, we are of opinion that the alleged incompatibility between the provisions in question is more apparent than real and certainly could not be regarded as so utterly repugnant and irreconcilable as to render it impossible for both to consistently stand together. It will be observed that the provisions of the Charter respecting the passage of ordinances are general in scope and make no reference to zoning ordinances; whereas Sections 4 and 5 of the Act of 1929 are concerned specifically with the procedure for the enactment of zoning ordinances. Furthermore, since the Charter merely prescribes a minimum advertising requirement of five days, the Act of 1929 does not run counter to this pro-

vision by lessening the prescribed period but instead fixes an additional requirement of ten days. The Charter provisions can and should be interpreted as being confined to ordinances other than those covered by specific statutory provisions, the latter being considered additional requisites for a particular subject. As stated in McQuillen, Municipal Corporations, Vol. 8, Sec. 25-245, p. 459: "To protect zoned areas against capricious, sudden or ill-considered changes, whether of district boundaries or of the classification of permissible and prohibited uses, there usually are statutory requirements governing procedure in the enactment, amendment or repeal that do not pertain to the enactment of ordinances generally.". This construction is in harmony with the rule that statutes in pari materia should be considered concurrently whenever possible and if they can be made to stand together effect should be given to both as far as possible. See *Walker's Appeal*, 332 Pa. 488, 2 A. 2d 770; *Nyce et al. v. Board of Commissioners et al.*, 319 Pa. 353, 179 A. 584; Statutory Construction Act of 1937, supra, §62, 46 PS §562.

Finally, the City argues that assuming Sections 4 and 5 of the Act of 1929 are still in effect today, there was no necessity for compliance with the requirements in the present case since (1) no one was prejudiced by the failure to observe the "technicality" of fifteen days' notice and (2) the three-fourths vote of Council was not applicable. Both of these contentions must be rejected; however, since either of the alleged defects would render the ordinance invalid, we deem it necessary only to answer the first argument advanced. In *Kline v. Harrisburg*, supra, at p. 450 it was stated: "It is customary for zoning statutes to outline the procedure through which a zoning system may be adopted and the general rule is that a zoning ordinance is invalid where it is not passed as provided by the enabling

statute. . .". Section 4 of the Act of 1929 reads as follows: "The Council of such city shall provide for the manner in which such regulations and restrictions, and the boundaries of such districts shall be determined, established and enforced, and from time to time amended, supplemented or changed. However no such regulations, restriction or boundary shall become effective until after a public hearing in relation thereto, at which parties in interest and *citizens* shall have an opportunity to be heard. At least fifteen (15) days' notice of the time and place of such hearing shall be published in an official paper, or a paper of general circulation, in such city.". (Emphasis supplied). We cannot say that because a substantial number of persons attended the councilmanic hearing, eight days, as is suggested, was more than sufficient notice of the hearing in this case. The fact that *some* citizens had actual notice is immaterial for the language of the Act is mandatory and where the Legislature in conferring police powers upon a city has with particularity, as it has here, designated a specified length of time respecting notice to citizens of a hearing, its clearly expressed and mandatory provisions cannot be relaxed. What was said in *Fierst et al. v. William Penn Memorial Corporation et al.,* 311 Pa. 263, 166 A. 761, in which this Court held a zoning ordinance invalid because of a statutory defect in publication, is applicable here: ". . .Failure to follow the express provisions of the law as to publication made the ordinance of no effect. There are numerous cases which hold that the publication of municipal ordinances is mandatory and until complied with as the law directs, such ordinances are ineffective: [Citing cases]". See also *Nyce et al. v. Board of Commissioners et al.,* supra.

We are satisfied that the injunction in the present case properly issued because of the invalidity of the

ordinance upon which the erection of the proposed in-cinerator was predicated.

In accordance with this opinion, the decree of the court below is modified to read as follows:

"It is hereby ordered, adjudged and decreed that an injunction issue restraining the City of Philadel-phia, its officers and agents, and each of them, from enforcing or attempting to enforce in any manner the Ordinance approved March 13, 1953, known as Bill No. 315." As thus modified, the decree is affirmed; the parties to bear their respective costs.