The West Shore School District and the Township of Lower Allen, Plaintiffs, *v.* Commonwealth of Pennsylvania, Milton J. Shapp, Governor; Israel Packel, Attorney General; Allyn R. Sielaff, Commissioner of Bureau of Correction; Stewart H. Werner, Deputy Commissioner of Bureau of Correction; Ernest S. Patton, Superintendent, State Correctional Institution at Camp Hill, Pennsylvania, Defendants.

Argued September 5, 1974, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Robert E. Yetter*, with him *Metzger, Wickersham, Knauss & Erb*, for plaintiffs.

*J. Andrew Smyser*, Deputy Attorney General, with him *Benjamin Lerner*, Deputy Attorney General, and *Israel Packel*, Attorney General, for defendants.

OPINION BY JUDGE WILKINSON, October 7, 1974:

This is an action in equity brought in our original jurisdiction. The plaintiffs seek an injunction to restrain the defendants from placing inmates outside the fenced area of the State Correctional Institution at

Camp Hill, Pennsylvania, to reside in what might be characterized as a "trailer camp." This trailer camp is more precisely defined as a Community Related Center and is designed for those inmates of the State Correctional Institution at Camp Hill who have obtained prerelease status as defined by the Bureau of Correction, Administrative Directive No. 805, duly approved by the Attorney General and filed with the Legislative Reference Bureau on March 21, 1973. These actions were taken pursuant to the authority and mandate of the Legislature in the Act of July 16, 1968, P. L. 351, *as amended*, 61 P.S. §1051, which provides in Section 1: "The Bureau of Correction, Department of Justice, shall have the power and its duty shall be to establish with the approval of the Governor such prisoner pre-release centers at such locations throughout the Commonwealth as it may deem necessary to carry out effective prisoner pre-release programs therefrom."

Some 100 pages of testimony were offered. However, the facts are not in dispute. The trailers, formerly used as part of the forestry camp program, are to be located outside the secured area of the Correctional Institution out of the view of the towers. Initially, it is anticipated that 10 inmates will become residents and the population gradually will be built up to 48. The doors of the trailers will face inward. There may be only one unarmed guard on duty at night. The trailers will be located in an R-1 Residential District with dwellings as close as 200 yards and an elementary school as near as perhaps one-half mile.

The witnesses for the plaintiffs testified that property values would be reduced and that the transfer of the inmates to become residents in this program constituted a real and present threat to their lives and property.

The testimony of the defendants was that while they could not guarantee that no untoward incident would

occur, every proper step was being taken to select only those inmates who were appropriate to the program. Although the witnesses for the plaintiffs feel strongly that the program is fundamentally unsound, nevertheless, the Legislature has mandated it. From the testimony, it is clear that some of the programs are carried on in a much more populated area than this one.

A serious crime may be committed at any place, at any time, and it seems obvious to all that today, they are committed with shocking regularity by individuals who are free, on parole, on pre-release programs, or have escaped from complete confinement.[1] Nevertheless, the Superintendent of this Institution, having been with the Bureau of Correction since 1948, and Superintendent here since 1968, could not remember a single incident in which an escaped inmate from this Institution caused bodily injury to a resident or to a school child in this School District or Township. This was uncontradicted. This is what distinguishes this situation from that obtaining in *Arkansas Release Guidance Foundation v. Needler,* 252 Ark. 194, 477 S.W. 2d 821 (1972). In that case, the "half-way house" that was enjoined had been in operation for several months and the residents of the half-way house had committed an offense involving carnal abuse and another involving the use of alcohol. Such are not the facts here. Rather, the instant facts are those which obtained in *Nicholson v. Connecticut Half-Way House, Inc.,* 153 Conn. 507, 218 A. 2d 383 (1958), where the institution had not opened and the Supreme Court of Connecticut reversed the lower court which granted the requested injunction.

---

[1] The writer of this opinion would be remiss if he did not note for the satisfaction of the plaintiffs that within 24 hours after the argument and assignment of the opinion-writing responsibility in this case, his home was burglarized by an escaped resident of a forestry camp of the State Correctional Institution at Rockview.

We cannot find that under all the facts in this case, the plaintiffs have offered such clear and convincing evidence that the contemplated use of this property will necessarily constitute an unreasonable use or that the establishment and operation of the Center will be an abuse of discretion that would justify the granting of an injunction. *See Kelly v. City of Philadelphia,* 382 Pa. 459, 115 A. 2d 238 (1955).

Because of its importance to the plaintiffs in this case, and to the public in general, we here set forth the affidavit submitted as part of the record in this case, being a statement of the Commissioner of Correction and the Superintendent of the State Correctional Institution at Camp Hill as to how this Community Related Center will be operated.[2]

"We, Allyn R. Sielaff and Ernest S. Patton, being duly sworn according to law do hereby set forth this as our statement of intent to establish a Community Related Center upon the grounds of the State Correctional Institution at Camp Hill, subject to the following conditions:

"1.   The Community Related Center shall consist of a group of nine (9) trailers of the type formerly utilized in the institution's forestry camp program which shall be located on the grounds of the Camp Hill Institution in proximity to necessary utilities and services of the institution.

"2.   All residents to be placed in the program shall be eligible and have obtained pre-release status as defined by the Bureau of Correction's regulations contained in Administrative Directive No. 805. Accordingly, each individual shall be screened by the institutional

---

[2] *See Commonwealth ex rel. Saunders v. Creamer,* 11 Pa. Commonwealth Ct. 160, 212 A. 2d 454 (1973), in which Judge BLATT discusses the procedures for screening, selecting and referring inmates to Community Treatment Centers by the Bureau of Correction.

Support Team which consists of a counselor, housing officer, work and school supervisor, and shall be thoroughly evaluated through the use of psychological testing. In addition, each case shall be submitted to the sentencing judge who shall have the opportunity to express objection to the program placement.

"3. Residents who have taken a life or committed the crime of rape, serious bodily assault, or molesting of a child shall be specifically excluded from participation in the program.

"4. Each individual approved for the program shall be within nine (9) months or less of his anticipated release date from the institution, which will provide an average of six (6) months participation.

"5. Ten (10) residents shall be initially assigned to the program with an anticipated increase of not more than ten (10) each month up to a total capacity of forty-eight (48).

"6. Initially the program will be operated on a five-day, Monday-through-Friday basis. Assigned personnel shall consist of a Program Director, one (1) Counselor and six (6) Correctional Officers providing twenty-four (24) hour supervision.

"7. The program shall be expanded to a seven (7) day operation at a future date dependent upon the availability of additional supervisory personnel.

"8. This shall be an extension of institutional programming and shall provide an opportunity for selected residents to participate in gainful employment, vocational or technical training, and academic education in the community in a structured manner so as to further enhance the successful rehabilitation of the individual.

"9. All regulations imposed by any state agency shall be complied with."

In the event the Community Related Center is not operated in this manner or in the event its operation in this manner in fact substantiates plaintiffs' appre-

hensions and fears, this Court is always open to reconsider the matter.

Accordingly, we must enter judgment for the defendants.