First National Bank of Millville, Appellant, *v.* Horwatt.

582

Argued March 7, 1960. Before Rhodes, P. J., Wright, Woodside, Ervin, Watkins, and Montgomery, JJ. (Gunther, J., absent).

*E. Eugene Eves*, with him *S. Keene Mitchell, Jr.*, and *Smith and Eves*, and *Bedford, Waller, Griffith, Darling & Mitchell*, for appellant.

*William J. Davis*, for appellee.

OPINION BY WOODSIDE, J., June 15, 1960:

This is an appeal from the order of the Court of Common Pleas of Luzerne County opening a judgment entered by the First National Bank of Millville against George Horwatt. The case grows out of the double financing of a vehicle by an automobile dealer.

The immediate, but not the ultimate, problem involved in this case will emerge from the facts condensed as follows: A buyer purchased a motor vehicle from a dealer by executing an installment sales contract and an attached note which were assigned to the First National Bank of Millville by the dealer. The buyer defaulted, and the bank entered judgment on the note. The buyer moved to open the judgment alleging that because of the fraud of the dealer, he had neither the vehicle nor the certificate of title thereto. His depositions indicate that several months after obtaining possession of the vehicle, he took it back to the dealer's garage for repairs and, while it was there, the Wyoming National Bank of Wilkes-Barre seized it, claiming the right to it under a floor-plan with the

dealer. The buyer claims that an application for a certificate of title to be issued to him and showing an encumbrance in favor of the Millville bank was executed and put among the dealer's mail for forwarding to the Bureau of Motor Vehicles, but the unmailed application was found by the Wilkes-Barre bank in the glove compartment of another automobile taken from the dealer. The buyer tendered payment of the note upon condition that the Millville bank would give him a certificate of title to the vehicle, which the bank could not do.

The court opened the judgment. Such order is within the sound discretion of the court below and will not be reversed except for a clear abuse of discretion. *Phila. Gas Heating Co. v. Sanders,* 181 Pa. Superior Ct. 510, 513, 124 A. 2d 435 (1956). Three reasons for opening the judgment were set forth in an opinion of Judge BROMINSKI, from which we adopt the following as applicable to the above facts:

(1) "Sec. 15(G) of the Motor Vehicle Sales Finance Act [of June 28, 1947, P. L. 1110], 69 P.S. §615(G), provides as follows:

'G. No installment sale contract shall require or entail the execution of any note or series of notes by the buyer, which when separately negotiated, will cut off as to third parties any right of action or defense which the buyer may have against the original seller.'

"The plaintiff argues that it is a holder in due course of a negotiable instrument and this precludes the defendant from introducing his defense against it which he may have had against the seller (assignor). To lend credence to such an argument would defeat the very purpose of Sec. 15(G) and would afford a purchaser of a motor vehicle no remedy whatsoever as to any defense which he may have against the seller and, particularly, as in the case here, where judgment

note is attached to the motor vehicle installment sale contract. The note being attached to the sales contract, of itself, gives notice to any assignee that the transaction is subject to Sec. 15(G) of the Motor Vehicle Sales Finance Act. So that it is not necessary to decide whether this note is negotiable in that the assignee has notice that the entire transaction is subject to the Motor Vehicle Sales Finance Act and, of course, Sec. 15(G) thereof.

(2) "In addition, the sales contract to which the note is physically attached recites that '. . . the assignee shall have all rights and be subject to all *obligations* of the seller hereunder.' [Emphasis by the court below]. Are we now to treat the note separately from the sales contract and consider it negotiable and the assignee [a] holder in due course? The words 'obligation of the seller' connotes any defense the purchaser may have against the seller. To come to any other conclusion would be contrary to sound reasoning, and particularly when the note was entered of record, the sales contract was part and parcel thereof. For this reason as well as the first, the defendant should be permitted to introduce his defense of failure of consideration and fraud.

(3) "There is also a third reason why this judgment should be opened. The facts are that on July 14, 1958, defendant tendered to plaintiff assignee a money order for the full amount due on said sales contract and requested the certificate of title to the motor vehicle which plaintiff did not and could not produce. See §30 of the Motor Vehicle Sales Finance Act, 69 P.S. §630, which provides that:

'B. When the final payment on an installment sale contract is made in cash, money order or equivalent tender by the buyer, or his authorized representative, at the designated licensed office of the holder, the cer-

tificate of title, showing satisfaction of this encumbrance, shall be delivered at the time of such tender of payment, if demanded by the buyer, otherwise delivery may be made at a later date in person or by mail as may be arranged between buyer and holder, all other instruments shall be delivered or mailed to the buyer within fifteen (15) days of the date of final payment.' "

The appellant contends that "the Motor Vehicle Sales Finance Act is repealed in a large part by the Uniform Commercial Code," of April 6, 1953, P. L. 3, 12A P.S. §1-101 et seq., and particularly with respect to the rights of the assignee of an installment sales contract and accompanying note.

The Finance Act is not among those acts specifically repealed by the Commercial Code, which, in addition to the specific repealers, contains the usual provision that "all acts or parts of acts inconsistent with this Act are hereby repealed." 1953 P. L. 181.

In certain particulars, including those which relate to this case, the two acts deal with the same subject matter, and when statutes are in pari materia they should be considered concurrently whenever possible. If they can be made to stand together, effect should be given to both as far as possible. *Kelly v. Philadelphia,* 382 Pa. 459, 473, 115 A. 2d 238 (1955); *Nyce v. Commissioners,* 319 Pa. 353, 358, 359, 179 A. 584 (1935); Statutory Construction Act of May 28, 1937, P. L. 1019, §62, 46 P.S. §562.

In determining whether a prior act is repealed by implication, the question is exclusively one of legislative intent. Repeals by implication are not favored and will not be implied unless there is an irreconcilable conflict between statutes embracing the same subject matter. The fact that the Uniform Commercial Code was enacted subsequent to the specific provisions in the Finance Act of 1947 and that there is a general

repealing clause in the Code is not necessarily conclusive on the issue of legislative intent. *Kelly v. Philadelphia, supra,* p. 471 (1955).

Article 9 of the Uniform Commercial Code, relating to Secured Transactions, provides in §9-201 that nothing in that article "validates any charge or practice illegal under any rule of law or regulation governing . . . retail installment sales, . . ." and in §9-203 that a transaction although subject to the article must also comply with the Motor Vehicle Sales Finance Act. 12A P.S. §9-201 and §9-203.

The legislature did not intend to repeal the Motor Vehicle Sales Finance Act by the passage of the Uniform Commercial Code.

The appellant argues that under §3-302 of the Code it is a holder of the note in due course and that under §3-305 it is insulated from the defenses which could be made against the dealer-payee. Pressing the argument under the Uniform Commercial Code further, appellant argues that even if it were subject to the defenses which the buyer has against the original seller in a case where it attempts to repossess the financed vehicle or to collect the debt through a levy upon that vehicle, it is not subject to the defenses when, as here, it enters a general judgment against the maker of the note. It quotes from paragraph 2 of the Uniform Commercial Code Comments of §9-206 as follows: "In lieu of the type of cut-off clause discussed in the preceding paragraph, a negotiable note is frequently executed in connection with a conditional sale contract or purchase money chattel mortgage. This section allows the note to have its normal operation except when secured by consumer goods. Where consumer goods are involved, subsection (1) makes even a holder in due course of the note subject to defenses if he seeks to enforce the security agreement or levies on the goods. Thus a

holder may be entitled to judgment on the note, but may become subject to a total or partial defense by making a subsequent levy on the goods."

If we read the comment to §9-206 further, it gives less comfort to the appellant. "Some retail installment selling acts and other comparable legislation now prohibit the use of negotiable notes in the consumer field. Such a provision should not be repealed by the enactment of this Article. Furthermore without statutory aid there are indications in the case law that courts are beginning to question the holder-in-due-course status of finance companies or banks regularly discounting a dealer's consumer chattel paper." The Pennsylvania Bar Association notes to §9-206 of the Code contain the following: "But in motor vehicle sales, the execution of such a note does not prevent the debtor from asserting against subsequent holders whatever defenses he may have against the seller. Motor Vehicle Sales Finance Act of 1947, §15G, 69 P.S. §615G."

If the appellant were a holder in due course of a separate note without knowledge that the note originated in connection with the financing of a motor vehicle sale, its contention that it is insulated from the defenses raised here *might* have merit. If this were the case, the provisions of the Uniform Commercial Code alone *might* control, and the Motor Vehicle Sales Finance Act would do no more than impose criminal liability upon the dealer for requiring of the buyer a note which could be separately negotiated in violation of §15(G) of the Act.[1] But, that is not this case.

---

[1] But see §3-103(2) of the Uniform Commercial Code which provides that the provisions of Article 3 are subject to the provisions of Article 9 which in §9-203 provides that the provision of Article 9 are subject to the provisions of the Motor Vehicle Sales Finance Act.

The note here was not *separately* negotiated. It was connected to and a part of the installment sales contract. The plaintiff knew, as the court below pointed out, that by virtue of §15(G), supra, the transfer from the dealer to it could not cut off, as to it, any right of action or defense which the buyer has against the original seller.

The mere fact that the Act contains criminal provisions for its violation does not mean, as contended by the appellant, that the legislature intended those to be the sole remedies of the buyer of a motor vehicle. See §59 of the Statutory Construction Act, supra.

*On the basis of the facts set forth above,* the defendant has a good defense against the plaintiff's claim. Therefore, the contention of the appellant that the defendant has not shown a prima facie case for a meritorious defense is not sound.

However, the thumbnail sketch of the facts set forth above is an oversimplification of this case, and our ruling on the limited issue now before us is not necessarily determinant of the ultimate issue. We used the abridged statement of the facts as a basis for the legal conclusions we have made above and to demonstrate that the court below should not be reversed for opening the judgment. A more detailed recital of the facts suggests that upon the trial of the case the defendant *may* not be able to establish a meritorious defense to the satisfaction of the fact-finder.

George Horwatt, the defendant-buyer in this case, was not dealing at arm's length with Wesley Motor Company, Inc., the dealer. Horwatt was sales manager of the dealer corporation. The depositions show that he knew the company was in financial difficulty. He was familiar with the procedure to be followed in the transfer of titles and the financing of motor vehicles. He personally went to the First National Bank

of Millville about January 30, 1958, with the installment sales contract and note which he said was "signed in blank by Mr. Wesley and myself," and gave the bank officials the information necessary for them to fill in the blanks. At the same time, he delivered to the bank another installment sales contract on another vehicle executed by another person and furnished the bank with the necessary information to fill in the blanks. He received the checks from the bank made payable to the corporation which he delivered to Mr. Wesley, the president of the corporation. Not until a month after he executed and delivered the note and received the check did he attempt to secure a certificate of title to the vehicle. He made no attempt to secure a license for the vehicle, but continued to operate it on the dealer's licenses of Wesley Auto Company, Inc. He did not allege that he made any payments on the note to any person, and he testified that he did not know that the note was in default until he received a letter from the bank dated May 19, 1958. From this it might be inferred that Horwatt understood that the payments were made or intended to be made by the Wesley Auto Company, Inc., and not by him, raising a doubt whether a bona fide transfer of ownership of the vehicle to him was ever intended. He apparently made no effort to retain or regain possession of the vehicle from the Wilkes-Barre bank, although the title of a buyer as against a floor planner is clear. See *Weisel v. McBride,* 191 Pa. Superior Ct. 411, 156 A. 2d 613 (1959).

The evidence is sketchy concerning the floor plan of the Wilkes-Barre bank and what happened to the vehicle and its title, and how the Wilkes-Barre bank obtained title and what that bank did with the application for title which Horwatt says was in a sealed envelope ready for mailing to the Bureau of Motor Vehicles.

The Millville bank was not an insurer of the defendant's vehicle. It need not protect the purchaser against loss of the vehicle as a result of illegal seizure by one other than the dealer. On the other hand, under the Motor Vehicle Sales Finance Act, supra, the Millville bank had a duty, upon the payment of the note, to deliver the certificate of title to the maker free and clear of its encumbrance. It was, or should have been, familiar with this requirement of the Finance Act and should have seen that it received the certificate of title with its encumbrance noted thereon from the Bureau of Motor Vehicles. Its neglect to do this over a period of months enabled the Wilkes-Barre bank to get possession of the untitled vehicle, and presumably to thereby obtain a certificate of title for it.

The Motor Vehicle Sales Finance Act was intended to protect installment purchasers of motor vehicles; it was not intended to establish a medium for agents and employes of dealers to participate with immunity in a dealer's scheme to double finance vehicles.

As a result of the dealer's apparent fraud and presumed insolvency, one of three people with whom he dealt in connection with the vehicle in question must suffer a loss. It cannot be properly determined which one should suffer the loss without opening the judgment, ascertaining all the facts and then applying the law.

Order affirmed.

---

DISSENTING OPINION BY MONTGOMERY, J.:

Appellant's judgment against appellee was opened by the lower court on the basis that the facts alleged in the petition to open and supported by the testimony taken in the depositions showed that appellee had a good defense against plaintiff's claim. I fail to see

the presence of such a defense. Appellee's petition to open appears to be based entirely upon the proposition that appellee was deprived of a certificate of title to the motor vehicle involved because C. D. Wesley, presumably the owner of the Wesley Auto Company, Inc., removed from the mail an envelope containing his application for his certificate as well as his check to cover the fee for same. Although the petition alleges further that the Wesley Auto Company, Inc., never delivered possession of the automobile to him or ever intended to do so, this allegation is contrary to the facts established by the depositions, which show that possession of the automobile was delivered to appellee and that he used the car for several months. Therefore, the only question in the case is that which relates to the procurement of the certificate of title.

The alleged facts appear as follows: Appellee, an employee (sales manager) of Wesley Auto Company, Inc. (hereinafter referred to as Wesley), bought a new Mercury station wagon from his employer and in payment thereof executed an installment purchase agreement with a judgment note attached, both of which were dated January 28, 1958; on January 30, 1958, they were assigned to appellant (hereinafter referred to as Millville) which advanced the purchase money and paid same to Wesley; appellee took possession of the automobile immediately and used it for several months, returning it to Wesley in April, 1958, for the purpose of having it repaired; while it was in Wesley's hands for that purpose, it was seized by Wyoming National Bank of Wilkes-Barre on May 8, 1958, under a floor-plan financing arrangement that had existed at the time that appellee had made his purchase; the appellee did not sign an application for a certificate of title at the time he purchased the automobile but did so about one month later, on February 24, 1958; the

application was made on Department of Revenue Form No. RVT-1 and showed the encumbrance in favor of Millville; however, for some reason, this application was never mailed, although it had been placed in a sealed envelope addressed to the Bureau of Motor Vehicles; it was found by a representative of the Wyoming Bank in another automobile seized from Wesley by the bank at the same time that appellee's automobile was seized by it; appellee had operated his vehicle on the dealer plates of Wesley until he returned it in April for repairs; he made no payments on account of the purchase agreement or the note; and he made no inquiry about his title; however, after the vehicle had been seized and after the judgment on the note had been entered against him, which occurred on May 29, 1958, he tendered on July 14, 1958, a money order to Millville for the full amount of the judgment and demanded the return of his certificate of title free of its encumbrance, but Millville, not having received the certificate of title, could not return it to him and consequently appellee withdrew his tender of payment; appellee has made no demand on Wesley at any time for the return of his vehicle which it had left with it for repairs.

The one responsible for the situation which confronts us is the Wesley Auto Company, Inc., which failed to remit to Wyoming the amount of its claim on the floor-plan financing arrangement on the vehicle sold to appellee. However, regardless of his knowledge of Wyoming's claim, if appellee were a bona fide purchaser who bought this motor vehicle from inventory in the regular course of business, his title to same would be good and free of any claim of Wyoming. Section 9-307 of the Uniform Commercial Code of 1953, April 6, P. L. 3 (12A P.S. §9-307) which section was fully discussed by this Court in *Weisel v. McBride,* 191

Pa. Superior Ct. 411, 156 A. 2d 613. It is not contended that Wyoming's lien reattached to the vehicle after its return to Wesley for repairs and I see no way that such a contention could be sustained. At the time appellee returned his car for repairs, he had good title thereto and, since it was not returned for resale or inventory purposes or to reestablish it under Wyoming's floor-plan arrangement, appellee's good title would be unaffected by his return of the vehicle for the purposes of repairs, and Wyoming's seizure of it was unlawful. This is not a situation, as between Wyoming and appellee, whereby one who permits another to retain possession of personal property with the appearance of ownership is held responsible as against an innocent party who deals wih the possessor as though he were owner. All dealings which Wyoming had in connection with this car were prior to the return of same to Wesley for repairs. Wyoming was not prejudiced or misled in any fashion by the return of the car to Wesley.

Good title to a motor vehicle may be had without the certificate issued by the Bureau of Motor Vehicles. *Speck Cadillac-Olds, Inc. v. Goodman,* 373 Pa. 83, 95 A. 2d 191; *Automobile Banking Corporation v. Draper,* 129 Pa. Superior Ct. 501, 195 A. 441; *Weigelt v. Factors Credit Corp.,* 174 Pa. Superior Ct. 400, 101 A. 2d 404. And one cannot be deprived of his title to personal property by the illegal act of another. The mere loss of possession of the vehicle, whether legally or illegally, would not be a good defense to appellant's judgment. The loss of possession was something that occurred after the assignment of the installment agreement and note to appellant; and, regardless of whether it holds the instruments subject to equities existing between the parties at the time of the assignment of same (which question need not be answered), it would not

be subject to equities arising between them after notice of the assignment was had by the maker. *Philips v. Bank of Lewistown,* 18 Pa. 394; *Ertel v. McCloskey,* 167 Pa. Superior Ct. 120, 74 A. 2d 652. Appellee in this case had immediate notice of the assignment, since he participated in the arrangements.

Since the matter of title and possession are not available to appellee as defenses in this matter, we must return to the original question of whether or not the alleged act of Wesley Auto Company, Inc., or C. D. Wesley in removing the application for title from the mail is sufficient reason for depriving appellant of the judgment which it now holds against appellee. At the outset, it must be noted that this application for certificate of title was not made until one month after the installment contract and the note had been assigned to Millville. Therefore, if there was any fraud or illegal act on the part of Wesley and its representatives, it was something that occurred after the assignment and Millville would not be held responsible for it. Further, in asserting this defense, appellee relies on section 30 of the Motor Vehicle Sales Finance Act of June 28, 1947, P. L. 1110 (69 P.S. §630) which requires the return of, *inter alia,* the certificate of title, showing satisfaction of the encumbrance upon full payment of same. He asserts that on July 14, 1958, he tendered a money order to Millville, for the full payment of the judgment and demanded the return of the certificate of title and other papers relating to the financing of the automobile and that their return was refused. This was a futile gesture and an insufficient reason for opening the judgment. In the first place, appellee knew that no certificate of title had ever been issued and that his application had never been mailed. He was advised of this at about the time Wyoming took possession of his vehicle, on or about May 8, 1958, by

Mr. Duffy, a representative of Wyoming, who showed him the envelope containing the RVT-1 form he had signed. Nevertheless, appellee did nothing, either by securing and mailing that form which he had previously signed or by preparing a new RVT-1 form for transmittal to the Bureau. Although it may not have been within his power to secure possession of the original from Mr. Duffy, it certainly was within his power to secure a new RVT-1 form and complete the registration of his motor vehicle. In addition to this, he knew for at least one month after he had purchased the vehicle that he had not applied for a title and that he had at all times operated on the Wesley dealer's plates. It is now too late to complain about Millville's failure to return the title when it was through his neglect or inaction that it was not procured. I think it unnecessary to discuss the matter of responsibility for mailing, because whether it was Wesley's duty to mail it or whether appellee delegated Wesley as his agent to mail it is immaterial. As previously stated, this all happened after the rights of Millville arose and therefore it should not bear the responsibility for any neglect or misdeed in connection therewith.

However, there is another good reason why appellee's demand for the return of the certificate of title is not a good reason for the opening of this judgment. Although he claims to have been unaware that his payments to Millville were in default, he is bound by his agreement and note, which provided for monthly payments commencing February 28, 1958. The judgment was not entered until May 29, 1958, when his payments were four months delinquent. If he was unaware that he was to make the payments and thought they were to be made by Wesley, then he is a major participant in the fraud that was perpetrated on Millville or on Wyoming. However, regardless, the defense he as-

serts was not present when the judgment was entered. At that time no payment had been made or tendered and his default justified the entry of the judgment.

Although appellee seeks to have the judgment opened, the defense that he asserts is really one of tender of payment. Payment or satisfaction of a judgment is not sufficient reason for opening it. The procedure to follow when payment is tendered and refused is to petition the court to pay the money to the Prothonotary of the court and have the judgment satisfied or have an issue awarded to determine how much if anything is still due. *Anderson v. Best,* 176 Pa. 498, 35 A. 194; *Olekszyk v. Walelko,* 92 Pa. Superior Ct. 565; *Brader v. Alinikoff,* 85 Pa. Superior Ct. 285.

The situation here presented does not call for the opening of the judgment under any circumstances but at most for the awarding of an issue as aforesaid. On this point it may be further stated that by tendering payment appellee has recognized the validity of the judgment both as to the legality of its entry and as to the correctness of its amount when entered.

The foregoing discussion has been based on the premise that appellee was a regular purchaser from inventory in the regular course of business and in good faith. If he was not and was in collusion with Wesley to double-finance this car to the detriment of either Wyoming or Millville, then the judgment should not be opened for that further reason. When a person is party to fraud, the law requires that he be left where found. A court of equity will not lend its aid to relieve a party from the consequences of his own fraud. *Kunkle's Appeals,* 107 Pa. 368; *Brady v. Laskowsky,* 90 Pa. Superior Ct. 370.

For the foregoing reasons, I dissent from the majority opinion in this case and would reverse the lower court's order opening the judgment.