## KENNARD, ET UX. *v.* RELIANCE, INC. d/b/a RAUB CREDIT CORPORATION

[No. 214, September Term, 1969.]

*Decided May 4, 1970.*

The cause was argued before HAMMOND, C. J., and McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*James J. White, III,* for appellants.

*Clayton C. Carter* for appellee.

SMITH, J., delivered the opinion of the Court.

We here consider the interrelationship between the provisions of subtitle 3 of the Uniform Commercial Code, Code (1964 Repl. Vol.), Art. 95B (UCC), and the Maryland Retail Installment Sales Act, Code (1957, 1969 Repl. Vol.), Art. 83, §§ 128-153, with particular reference to § 147 of the Retail Installment Sales Act which provides in pertinent part:

"If, as part of an installment transaction, a

note is taken by the seller * * *, such note shall refer to the installment agreement out of which it arises and, in the hands of any subsequent holder, such note shall be subject to all defenses which the buyer might have asserted against the seller * * *."

Appellee, Reliance, Inc. (Reliance), does business as Raub Credit Corporation. It sued the appellants, Clark E. Kennard and Elsie Kennard, his wife, on their promissory note. Reliance was the assignee of the note.

It is interesting to note that prior to the introduction into evidence by Mr. and Mrs. Kennard of the installment sale agreement, the Reliance vice-president said, "I haven't the least idea." in response to a question as to whether he knew that the seller "took a contract with the Kennards in this case". The note contained authority for confession of judgment. Nevertheless, there was no attempt made to obtain judgment by confession. This may have been tacit recognition by Reliance that under §§ 130 (b) and 149 (b) such provision would have been "absolutely void" if the Retail Installment Sales Act were applicable to the transaction.

The matter ultimately was removed to the Circuit Court for Talbot County where it came on for trial without a jury. Judgment was entered in favor of Reliance. We shall remand without affirmance or reversal for further proceedings under Maryland Rule 871.

The series of events giving rise to this litigation began on Thursday, June 23, 1966, when a representative of Meadowbrook Company of Middletown, Delaware, came to the Kennard home to sell a water softener. An agreement was entered into on that day to purchase the water softener. The trial judge found, correctly, that the agreement signed at that time by Mr. and Mrs. Kennard was an installment sale agreement within the purview of the Retail Installment Sales Act. The agreement did not contain the disclosures required by § 129. Counsel for Mr. and Mrs. Kennard advised the trial judge that there

was delivered to the buyer a copy of the agreement signed by the seller as required by § 128 (b). The agreement had on it no provision for acknowledging receipt of a copy signed by the seller.

Reliance says that on Thursday credit data was taken which was transmitted to Reliance by telephone. After investigation by Reliance, Meadowbrook was notified of the approval by Reliance of Mr. and Mrs. Kennard from a credit standpoint.

On Friday, June 24, the Meadowbrook representative or representatives returned to the Kennard home. At that time a note was signed which became the subject of this litigation. At the same time a completion certificate was signed. Meadowbrook then proceeded with the installation of the water softener. The note and completion certificate were on forms provided by Reliance. The completion certificate was attached to the note, there being perforations to facilitate removal. The completion certificate read as follows:

> "I/we the undersigned hereby certify that all materials and/or labor in connection with the note arranged through RELIANCE, INC., have been furnished as agreed and accepted as satisfactory and the company is authorized and directed to pay the proceeds of said note to the CONTRACTOR DEALER named in my *signed* Credit Application. I/we the undersigned also authorize detachment of my/our note from this certificate and if said note is undated hereby authorize any of the parties interested in this transaction to insert the date hereof as the date of said note.

> "NOTICE Do not sign this Certificate until the work or materials have been satisfactorily completed or delivered. The selection of a dealer, the acceptance of materials used and work performed is YOUR responsibility. RELIANCE, INC. does NOT guarantee the material or work-

manship or inspect the work performed." (emphasis added)

The completion certificate was signed only by Mr. Kennard. The testimony is undisputed that there was no *signed* credit application.

The office from which this transaction was handled by Reliance is at Lancaster, Pennsylvania. The corporation is described by its vice-president as a sales finance company purchasing notes from dealers and contractors throughout a five-state area (Pennsylvania, Maryland, Virginia, New York and Delaware) covered by that office.

The vice-president of Reliance testified that the note of Mr. and Mrs. Kennard was received by it on Monday, June 27, and that on the same day Reliance mailed the check to Meadowbrook. He quite obviously is mistaken on the latter point. Middletown, Delaware, the home of Meadowbrook, is a town approximately three miles east of the Maryland-Delaware line, about 70-75 miles by road from the office of Reliance at Lancaster, Pennsylvania. The check in question was dated June 27, was deposited to the account of Meadowbrook in Industrial Valley Bank and Trust Company at Jenkintown, Pennsylvania, on June 27, and was paid by the Philadelphia bank on which it was drawn on June 28. The distance from Lancaster to Jenkintown is between 75 and 80 miles and the distance from Jenkintown to Middletown about 70 miles. Jenkintown is one of the northern suburbs of Philadelphia. It would be manifestly impossible for the check to have been mailed out on the 27th to Meadowbrook at Middletown, deposited by it on the same day at Jenkintown, and then paid the following day in Philadelphia.

Mr. and Mrs. Kennard made four payments on the note. They ceased payment when, according to them, they were unable to obtain satisfaction relative to their complaint as to the operation of the water softener. They said it worked satisfactorily for about 30 days. They ultimately disconnected it from their water system because, accord-

ing to them, it kept their well dry by failing to stop regenerating itself.

The note in question was assigned by Meadowbrook to Reliance without recourse. The assignment form was printed on the back of the note. The exact language is:

> "Pay to the Order of Reliance, Inc., without recourse except the endorser hereby warrants and represents that all articles and materials have been furnished and installed and all work satisfactorily completed, which constitutes the entire consideration for which this note was executed and delivered by maker."

Nothing appears in the record to indicate whether Meadowbrook was a corporation, a partnership or an individual trading under that name. The vice-president of Reliance testified that in a two-year period his company purchased approximately 200 or 225 notes from Meadowbrook, indicative of reasonable familiarity by the officials of Reliance with Meadowbrook and its operations.

The exact financial basis of the note does not clearly appear. It called for payments of $19.21 per month beginning October 25, 1966. It is clear from the testimony that Reliance actually paid Meadowbrook $839.00, which is the amount which was due from Mr. and Mrs. Kennard to Meadowbrook on the water softener, the original purchase price having been $849.00 and they having paid $10.00 down. The note was in the amount of $1,152.60. The Reliance vice-president testified that the rate in effect at that time was 6½%, that one would multiply that by five years and then take that percentage of $839.00. Even if allowance is made for the fact that, although the note was payable over a five-year period, the first payment was not due until four months after the date of the note, the matter does not work out mathematically on this formula. The explanation may well be in the life insurance that was provided by Reliance for Mr. Kennard. The above serves to demonstrate the wisdom of the disclosure provisions of § 129.

The trial judge found Reliance to be a holder in due course, although counsel for Kennard specifically raised the question of the applicability of the Retail Installment Sales Act with particular reference to § 147. In this Court the parties devoted their argument primarily to the question of whether Reliance was in fact a holder in due course.

The holder in due course provisions of the Uniform Negotiable Instruments Law in effect in Maryland prior to the adoption of the UCC were found in Code (1957), Art. 13, § 73. The UCC holder in due course provisions are found in Code (1964 Repl. Vol.), Art. 95B, § 3-302.

Discontent has existed in many parts of the country relative to dealings where finance companies provide, as here, the printed forms of notes for sellers and have become the assignees of the notes. See 11 Am.Jur.2d, *Bills and Notes,* § 440 (1963), with reference to "Close business association of payee and holder". Although, as is indicated in the comment in American Jurisprudence 2d, it probably is the minority point of view, it is a very respectable minority that has held in such situations that the finance company was not a holder in due course. See *Jones v. Approved Bancredit Corp.,* 256 A. 2d 739 (Del. 1969) ; *American Plan Corp. v. Woods,* 16 Ohio App.2d 1, 240 N.E.2d 886 (1968) ; *Unico v. Owen,* 50 N. J. 101, 232 A. 2d 405 (1967), and cases there cited. *American Plan Corp. v. Woods, supra,* is the only case found arising under the UCC.

The Maryland Retail Installment Sales Act was passed in 1941. It was first before this Court in *Stride v. Martin,* 184 Md. 446, 41 A. 2d 489 (1945), where at page 452 Judge (later Chief Judge) Markell observed, "[T]he Maryland act aims not only to prevent actual frauds (*Cooke v. Real Estate Trust Co.,* 180 Md. 133, 139, 22 A. 2d 554), but to close avenues to fraud."

Under the holding of this Court in *Griffin v. Balto. S. & L. Ass'n,* 204 Md. 154, 102 A. 2d 804 (1954), if Reliance here knew of the installment sale agreement, we are not obliged to determine just how the UCC and the Re-

tail Installment Sales Act may or may not fit together, nor are we obliged to determine whether for any other reason Reliance might not be a holder in due course. In *Griffin* there was, as here, a note which did not refer to the installment sale agreement. It contained a confession of judgment provision which was in violation of what is now § 130. A motion was made in the trial court to strike the judgment on the grounds that the authorized confessed judgment was void because in violation of the statute. The trial court held that the holder was a holder in due course and that the Retail Installment Sales Act was inapplicable. In an opinion by Judge (later Chief Judge) Henderson, the Court said:

> "The failure to include in the note in the instant case a reference to the agreement was, of course, a violation of the statute that cannot inure to the benefit of the holder who is clearly shown to have had actual notice. Nor can we doubt that the note was an integral part of an instalment transaction known to the appellee. It follows that the note is open at least to the defense here asserted against the entry of a judgment by confession. We need not at this time express any opinion as to what other defenses, if any, may be open upon a trial of the pending action. We think the motion to strike should have been granted and the judgment set aside." *Id.* at 160.

Almost precisely the same conclusion was reached in two Pennsylvania cases, *First National Bank of Millville v. Horwatt,* 192 Pa. Super. 581, 162 A. 2d 60 (1960), and *Casey v. Phila. Auto Sales Co.,* 428 Pa. 155, 236 A. 2d 800 (1968), which arose under a Pennsylvania statute which provided relative to motor vehicles:

> "No installment sale contract shall require or entail the execution of any note or series of notes by the buyer, which when separately negotiated, will cut off as to third parties any right

of action or defense which the buyer may have against the original seller."

The contention was made that this act was repealed by enactment of the UCC. *First National v. Horwatt, supra,* held the act was not so repealed and *Casey v. Phila. Auto Sales Co., supra,* cited *First National v. Horwatt, supra,* with approval. In *First National v. Horwatt, supra,* the court said:

"If the appellant were a holder in due course of a separate note without knowledge that the note originated in connection with the financing of a motor vehicle sale, its contention that it is insulated from the defenses raised here *might* have merit. If this were the case, the provisions of the Uniform Commercial Code alone *might* control, and the Motor Vehicles Sales Finance Act would do no more than impose criminal liability upon the dealer for requiring of the buyer a note which could be separately negotiated in violation of § 15 (G) of the Act. But, that is not this case." *Id.* at 588. (emphasis in original)

The Pennsylvania court added a footnote:

"But see § 3-103 (2) of the Uniform Commercial Code which provides that the provisions of Article 3 are subject to the provisions of Article 9 which in § 9-203 provides that the provisions of Article 9 are subject to the provisions of the Motor Vehicle Sales Finance Act."

Section 3-103 (2) of the UCC is identical in Maryland and Pennsylvania. Section 9-203 of the Maryland UCC provides in pertinent part:

"(2) A transaction, although subject to this subtitle, may also be subject to other statutes regulating loans and retail installment sales such as * * * Article 83, §§ 128 through 153,

Retail Installment Sales, and the like, and in the case of conflict between the provisions of this subtitle and any such statutes, the provisions of such statute control."

In *Casey v. Phila. Auto Sales Co., supra,* the court said:

"There is no question, under the facts of this case, that the Finance Company must have known it was financing the purchase of an automobile and that any defenses the buyer could assert with respect to the purchase could be asserted equally against the judgment creditor." *Id.* at 158.

As previously indicated, the transactions between Meadowbrook and Reliance, according to the testimony of the Reliance vice-president, averaged about two per week over a two-year period. He was the only witness for Reliance. He showed substantial familiarity with the Meadowbrook operations in his testimony, a portion of which is reproduced below:

"Q. Now do you still deal with Meadowbrook Company? A. No. Meadowbrook Company was forced out of business about a year and a half ago when the manufacturer stopped making the equipment.

"Q. What kind of equipment were you referring to? A. Meadowbrook Company installed, along with several things, one thing they did install, and the main item, was hydromatic water conditioners made in Reading, Pennsylvania, by the Hydromatic, and about a year and a half ago they went out of business.

"Q. What are these, water softeners, that Meadowbrook bought; what was the nature of the operation of this equipment? A. I am afraid you are going to lose me there. All I know is water softeners that use some source [sic] of chemicals apparently to purify the water, take

iron or salt or something out of it. I don't know much about it.

\* \* \*

"Q. How do you explain that the note was taken on June 24th? A. The only explanation I can give you, we know through our own experience in Pennsylvania, through our dealers in that area, invariably they will install the equipment the same date it is contracted for. There is only an hour or so installation, and there are several occasions that our dealers don't have anything signed, the note or the completion certificate, until the job is completed. The note and the completion certificate together can be signed in a great many cases when the job is done. This happens from what our dealers tell us."

The transaction between Reliance and Meadowbrook was handled by telephone. Reliance supplied the forms.

It is for the trial judge to pass upon the credibility of the witnesses. From where we sit we find ourselves somewhat dubious of the contention of Reliance that it did not know of the existence of an installment sale agreement. Upon the remand the trial judge will wish to give very careful consideration to determining whether Reliance knew that this was a transaction coming within the purview of the Retail Installment Sales Act. If it knew this were such a transaction, then under *Griffin v. Balto. Fed. S. & L. Ass'n, supra,* § 147 of the Retail Installment Sales Act would be applicable. Consideration would then be given to defenses that might exist on the part of the buyers against the seller. If it were to be found that the buyer did not have a good defense against the seller, then the trial judge would wish to consider § 149 of that Act since it precludes collection of any finance charge where the original installment agreement does not contain "the material required by §§ 128 and 129".

There is a second basis upon which defenses Mr. and Mrs. Kennard might have against Meadowbrook might be

held preserved. Therefore, if the trial judge determines Reliance did not have knowledge of the fact that this was a transaction coming within the purview of the Retail Installment Sales Act, then he will wish to give careful consideration to the intimacy of the contacts between Reliance and Meadowbrook for the purpose of determining whether the Reliance knowledge of the Meadowbrook operation was such as to make Reliance not a holder in due course under the "good faith" provisions of § 3-302 of the UCC. Although he previously determined Reliance to be a holder in due course, he does not appear to have considered whether the relationship between Reliance and Meadowbrook was so close as to make Reliance not a holder in due course.

A third basis for preserving the Kennard defenses would be if, notwithstanding the enactment of the UCC, § 147 of the Retail Installment Sales Act were held applicable to a note given in connection with an installment sales agreement when the note, as here, fails to make reference to that agreement and the note is held by one without knowledge of that agreement. We leave that question open at this time.

*Remanded for further proceedings without affirmance or reversal, costs to abide the final result.*