## Iron and Glass Bank v. Franz

420

*Robert W. McClure*, for plaintiff.
*Donald J. Lee*, for defendants.

WETTICK, *J.*, October 4, 1978—These are actions by Iron and Glass Bank (Iron and Glass) to recover money allegedly owing on two loan agreements. In defendants' answer and new matter, defendants aver that they are excused from making payments on the loan agreements because the proceeds from the loans were used to purchase goods and services from First Lady Spa, Inc. (Spa), which breached its agreements with defendants. In their new matter, defendants further aver that the promissory notes upon which plaintiff sued were executed to purchase these goods and services; that the promissory notes were prepared by, at the direction of and in the offices of Spa; and that Iron and Glass and Spa had a long course of dealings in which all loan documents dealing with the purchase of memberships in Spa were prepared by employes of Spa in the name of Iron and Glass in an effort to defraud buyers by cutting off rights and defenses.

Iron and Glass has filed motions for judgments on the pleadings. The issue raised by these motions is whether Iron and Glass, as the holder of these

promissory notes, is subject to the claims and defenses which defendants may have against Spa.

## I.

Iron and Glass contends that it entered into a simple cash loan agreement with defendants, governed by the Consumer Discount Company Act of April 8, 1937, P.L. 262, as amended, 7 P.S. §6201, and consequently the default by a third party from whom defendants purchased goods and services with the funds which they borrowed from Iron and Glass has nothing to do with the transactions between Iron and Glass and defendants. In support of this contention, Iron and Glass relies upon the documents governing the transactions which on their face are personal loan agreements between Iron and Glass and defendants.

Defendants, on the other hand, contend that these transactions are governed by the Goods and Services Installment Sales Act of October 28, 1966, P.L. 55, sec. 101, 69 P.S. §1101 et seq., which protects claims of buyers from being cut off through assignment (see §1401(a) of the act). The Goods and Services Installment Sales Act governs retail installment contracts which include any contracts for a retail installment sale between a buyer and a seller of goods and services purchased for other than a commercial or business use. (See the definitions of "retail installment contract" (§1201(6)), "retail installment sale" (§1201(5)), "goods" (§1201(1)), "services" (§1201(2)), "retail seller" (§1201(3)), and "retail buyer" (§1201(4)). Thus the critical issue is whether we view the Spa/Iron and Glass/defendants' dealings as a single transaction for the purchase of goods and services for a time

sale price payable in installments or as a cash transaction between Spa and defendants for the purchase of goods and services with proceeds obtained from a separate loan transaction between Iron and Glass and defendants. And for the reasons set forth below, we believe that Spa/Iron and Glass/defendants dealings should be treated as a single transaction.

According to the allegations in defendants' pleadings, defendants approached Spa to purchase goods and services on credit; it was the decision of Spa to provide the credit through Iron and Glass's papers; Iron and Glass was selected by Spa—and not defendants; and the proceeds from the loan could be used only to purchase goods and services from Spa.

Under these facts the transaction although purportedly cast as two events—a loan and a sale of goods and services—is actually one transaction for the purchase of goods and services on credit because the purchase is part and parcel of the loan agreement. And because the legislature, through the Goods and Services Installment Sales Act, provides protections to consumers who purchase goods and services on credit, such protections should extend to all credit transactions in which the seller supplies, provides or arranges for the extension of credit in order to effect the purposes of the legislation. Unless we look at substance—and not form —to determine when the Goods and Services Installment Sales Act applies, we permit the act to be avoided at the will of the very persons whom the act is intended to regulate. Clearly, this could not have been the intention of our legislature.

In almost every consumer credit transaction, financing is ultimately provided by a lending institution. Typically, the purchaser enters into an installment sales agreement with the seller and the

seller immediately assigns this agreement to a lending institution which has already reviewed the purchaser's credit rating and agreed to accept the assignment. The seller, however, accomplishes the same result by using the documents of the lending institution to which the installment sales agreement would have been assigned. Thus if we permit the seller who secures credit in this fashion to avoid the Goods and Services Installment Sales Act, we render ineffective the regulatory scheme.

The Goods and Services Installment Sales Act is remedial legislation which should be broadly construed to effect the goals of the act. See Com. v. Monumental Properties, Inc., 459 Pa. 450, 329 A. 2d 812 (1974). And where a sale of goods and services is part and parcel of a loan agreement, it should not be treated separately. See First National Bank of Millville v. Horwatt, 192 Pa. Superior Ct. 581, 162 A. 2d 60 (1960); Paul R. Webber, Inc. v. Duffy, 10 Lebanon 475 (1965);[1] Casey v. Philadelphia Auto Sales Co., 428 Pa. 155, 236 A. 2d 800 (1968); Transnational Consumer Discount Company of Erie v. Weaver, 52 Erie 4 (1968); but see Beacon Loan Corp. v. Kemmerer, 51 Luz. 199 (1961).

Section 102 of the Goods and Services Install-

---

1. In Paul R. Webber, Inc. v. Duffy, the buyers went to an automobile dealer to purchase a car. While the papers for the financing of the automobile were prepared by the dealer's employes, they were in the form of a direct loan security agreement between the buyers and a bank. The court, however, held that the transaction was subject to the terms and conditions of the Motor Vehicle Sales Finance Act, saying, "Even though the instrument appears in form to be a direct loan security agreement, it is in substance an installment sales contract within the meaning and purpose of the Motor Vehicle Sales Finance Act." p. 479.

ment Sales Act, 69 P.S. §1102, provides that: "Any waiver by the buyer of the provisions of this act shall be deemed contrary to public policy and shall be unenforceable and void." Since the legislature does not permit a seller to take away even one protection provided by the act through a contractural provision purporting to waive the protection, it did not intend to permit a seller to deny a buyer each and every protection provided by the act by using contractual forms which purport to place the transaction outside the act. Thus, if a buyer approaches a seller to purchase goods or services on credit and the seller refers the buyer to the creditor, at least where the seller and creditor are affiliated by control, contract or business arrangement,[2] we believe that the legislature intended for the buyer to receive the protections of the Goods and Services Installment Sales Act.

We recognize that if we placed the Spa/Iron and Glass/defendants' transaction outside the scope of the Goods and Services Installment Sales Act, the transaction would be governed by the Consumer Discount Company Act which regulates direct loans not in excess of $5,000. This act, which was enacted 29 years before the passage of the Goods and Services Installment Sales Act, contains few of the protections afforded the consumer under the

2. Business arrangement is defined by the recently adopted Federal Trade Commission Trade Regulation Rule which preserves consumer claims and defenses as "any understanding, procedure, course of dealing, or arrangement, formal or informal, between a creditor and a seller, in connection with the sale of goods or services to consumers or the financing thereof."

Goods and Services Installment Sales Act. The protections provided by the Goods and Services Installment Sales Act which would be lost if the transaction was, instead, governed by the Consumer Discount Company Act, include a meaningful disclosure of the entire transaction, the preservation of defenses arising out of the underlying sales transaction, private remedies for violations of the legislation, venue requirements, protections from repossession and acceleration and restrictions on liens against the consumer's property. And because the Consumer Discount Company Act does not provide substantially similar protections, we do not believe that the legislature intended to permit the seller to determine whether a transaction shall be governed by the Goods and Services Installment Sales Act or the Consumer Discount Company Act.

The matters raised in this portion of this court's opinion were recently considered by the Pennsylvania Superior Court in Anderson v. The Automobile Fund, _____ Pa. Superior Ct. _____, 391 A. 2d 642 (1978). The issue in this case was whether a loan agreement between a lending institution and a borrower who obtained the loan to purchase a used car through the active participation of the automobile dealer from whom the car was purchased would be governed by the Motor Vehicle Sales Finance Act of June 28, 1947, P.L. 1110, as amended, 69 P.S. §601 et seq., or the Consumer Discount Company Act. Only six members of the court participated in the decision and they divided equally on this issue.

It is not clear that each of the three judges who rules that a loan arranged by an automobile dealer on behalf of a customer for the purchase of a car

does not come within the scope of the Motor Vehicle Sales Finance Act would reach the same result if the question were whether a loan arranged by a seller of goods or services on behalf of a customer comes within the scope of the Consumer Goods and Services Installment Sales Act.

The opinion which placed the transaction outside the coverage of the Motor Vehicle Sales Finance Act relies on section 36 of the act which provides this act shall not affect or impair any business conducted lawfully under license issued pursuant to the Consumer Discount Company Act. The Goods and Services Installment Sales Act has no similar provision. And, in addition, section 2301 of this act repeals all acts or parts of acts which are inconsistent with this act.

Also, the Motor Vehicle Sales Finance Act is enforced primarily through criminal sanctions and this appears to be the basis of a previous ruling which held that the act shall be strictly construed. See Waterbor, Inc. v. Livingood, 179 Pa. Superior Ct. 610, 616, 117 A. 2d 790 (1955). The Goods and Services Installment Sales Act, on the other hand, provides for private remedies. And, thus, this legislation should be broadly construed to effect the purposes for its enactment. See Com. v. Monumental Properties, Inc., supra.

## II.

The Federal Trade Commission recently adopted a trade regulation rule which makes it unlawful for a seller of consumer goods or services who refers consumers to a creditor to accept, as payment for the goods or services, proceeds from the creditor unless the loan agreement between the consumer and the creditor contains a provision subjecting the

holder of the agreement to all claims and defenses which the debtor could assert against the seller of the goods or services.[3]

If the allegations in defendants' answer and new matter are correct, Spa violated this trade regulation rule by referring defendants to Iron and Glass and accepting, as payment for its goods and services, the proceeds from a loan agreement between Iron and Glass and defendants which did not contain a provision subjecting the holder of the agreement to any claims and defenses which defendants could assert against Spa. However, these allegations set forth no violation of the Federal trade regulation rule on the part of Iron and Glass because the rule, as presently drafted, places a duty only on the seller to insure that the preservation of defenses provision is included within the loan agreement. Thus as a matter of Federal law, defendants' answer and new matter do not set forth a defense to plaintiff's action arising out of this Federal trade regulation rule.[4]

However, where a creditor knows that a seller of goods or services is acting in an illegal manner as a matter of state law, the creditor shall not be insulated from the seller's wrongdoings. Although the Motor Vehicle Sales Finance Act makes it unlawful

---

3. 16 C.F.R. §433.1 et seq.

4. Also it is unclear what Federal remedies are available to a party who is injured through a violation of this FTC trade regulation rule. On the question of remedies, the rule provides only that noncompliance constitutes an "unfair or deceptive act or practice" within the meaning of section 5 of the Federal Trade Commission Act of September 26, 1914, 38 Stat. 717, 15 U.S.C.A. §§41-58 (1973); thus it is not clear whether as a matter of Federal law if a violation of the rule creates a private action on behalf of the consumer.

only for the seller to require the execution of a note by the buyer which, when separately negotiated, will cut off rights or defenses which the buyer may have against the original seller (69 P.S. §615(G)), our appellate courts have held that the assignee of a negotiable note executed in violation of this act, who knows or should have known of the violation, takes the note subject to any rights or defenses which the buyer may have against the original seller. See First National Bank of Millville v. Horwatt, supra; Casey v. Philadelphia Auto Sales Co., supra. Also see Norman v. World Wide Distributors, Inc., 202 Pa. Superior Ct. 53, 195 A. 2d 115 (1963), and cases cited therein which deny a holder in due course status to an assignee who should have been aware of the assignor's fraudulent and illegal business practices.

In addition, we rule that Iron and Glass's knowing participation in a transaction which violated the FTC "preservation of defenses" trade regulation rule constitutes an unfair or deceptive act or practice within the meaning of section 2(4)(xvii) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law of December 17, 1968, P.L. 1224, as amended, 73 P.S. §201-1, which defines an unfair or deceptive act or practice to include "engaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding." Thus defendants are entitled to the protections of section 3 of the act which declares unlawful any unfair or deceptive act or practice, as defined in section 2 of this act. (See section 9.2 of the act which provides private remedies for unlawful acts.)

The FTC regulation preserving defenses serves to eliminate confusion and misunderstanding created through an artificial bifurcation of a transaction by

an installment seller in an effort to insulate the duty to pay from the duty to perform. The FTC is a Federal regulatory body created by Congress to, inter alia, develop commercial standards which bar practices that are overreaching and unfair. Consequently, where the FTC has defined conduct which creates a likelihood of confusion or mistake as an unfair trade practice, we construe our Unfair Trade Practices and Consumer Protection Law to incorporate this standard.

This construction of section 2(4)(xvii) of this act is supported by Com. v. Monumental Properties, Inc., supra. According to the court's decision in the Monumental Properties case, the Pennsylvania Unfair Trade Practices and Consumer Protection Law is remedial legislation which shall be liberally construed to effect the purpose of preventing fraud (329 A. 2d at 816-7). The legislature, according to our Supreme Court, chose not to delineate precisely the types of unfair and deceptive practices outlawed but rather chose a more flexible standard because of the recognition of the legislature that "no sooner is one fraud specifically defined and outlawed then another variant of it appears" (459 Pa. at 479, 329 A. 2d at 826). And thus this section was designed to cover "generally all unfair and deceptive acts or practices in the conduct of trade or commerce" (478 Pa. at 478, 329 A. 2d at 826).

According to the Monumental Properties decision, our Consumer Protection Law is based upon the Federal Trade Commission Act of September 26, 1914, 38 Stat. 717, as amended, (15 U.S.C.A. §§41-58), and Lanhan Trade Mark Act of July 5, 1946, 60 Stat. 427, as amended, (15 U.S.C.A. §§1051-1127), and we should look to decisions under these acts for guidance and interpretation (329 A. 2d at 817-8).

The FTC trade regulation rule barring the cut-off of defenses by assignment was promulgated pursuant to the provisions of the Federal Trade Commission Act which declare unlawful "unfair methods of competition" and "unfair or deceptive acts or practices." Thus by enforcing this trade regulation rule through the Pennsylvania Unfair Trade Practices and Consumer Protection Law which also outlaws "unfair methods of competition" and "unfair or deceptive acts or practices," we are using Federal models of the state consumer protection law "for guidance and interpretation" (329 A. 2d at 818).

Because the allegations within defendants' answer and new matter that Spa arranged the Iron and Glass/defendants loan, that defendants used the funds from this loan to purchase goods and services from Spa, and that Spa breached its agreement with defendants entitle defendants to assert against Iron and Glass any claims and defenses which defendants could assert against Spa, we deny Iron and Glass's motions for judgment on the pleadings.

## ORDER

And now, October 4, 1978, it is hereby ordered that plaintiff's motions for judgment on the pleadings are denied.